TYMKOVICH, C.J., concurring in part and dissenting in part.
American legal thought is famed for its focus on procedure. And there is good reason: as every first-year civil procedure student learns, substance and procedure frequently form a Gordian knot-impossible to disentangle.[1] This insight carries over into the Law of Democracy. One change to procedure can work a profound change to the substance of political parties, including which candidates they choose and what messages they communicate.
In this case, the Utah Republican Party claims that Utah's 2014 election law reforms purposely try to change the substantive type of candidates the Party nominates, all the while masquerading as mere procedural reform. If true, such a project would severely burden the Party's associational rights, and without compelling justifications, it would be unconstitutional.
Because that is exactly what Utah has tried to do and because Utah has not provided adequate justification for placing such a burden on the Party's associational rights, I would hold Utah's election law violates the First Amendment. Though I dissent for this reason, I concur with the majority that the number of signatures required by the law's signature-gathering provision does not violate the Constitution.
I. Background
The Utah Republican Party argues Utah's recent reforms violate its First Amendment associational rights. Utah's Lieutenant Governor contends Utah's legislation is well within the state's regulatory power over elections. To evaluate these claims, we must first look at what those reforms sought to accomplish.
A. Utah Republican Party's Nomination Procedures
Before Utah passed legislation known as Senate Bill 54 in 2014, Utah election law gave political parties freedom to choose how they would nominate candidates for the general election. Parties could choose whether or not to use the state's primary election mechanism.
*1247 With that freedom, the Utah Republican Party chose not to use the primary as its principal means of selecting candidates. Instead, the Party had, and continues to employ, a carefully crafted convention process. Party members in defined precincts conduct neighborhood caucus meetings. In accordance with the Republican Party's bylaws, each caucus meeting is open to the public and begins with prayer, a recitation of the pledge of allegiance, and a reading of the Party's platform. The caucus attendees in turn select community representatives to serve as delegates to the Party's convention, where nominees will eventually be considered and selected.
The Party's nominating conventions are also open to the public. After candidates or their representatives make nomination speeches, delegates cast their votes for candidates to each office. If a candidate obtains sixty percent of the vote, he or she becomes the Party's nominee for that office in the general election. If there are more than two aspiring candidates for a given office, ballots are conducted until there are only two remaining candidates or until a candidate gains sixty percent of the vote. And if there are two candidates left and neither has obtained sixty percent of the vote, the candidates participate in a primary election run by the state. This means the Party uses the primary election mechanism only when no candidate for a contested office could obtain sixty percent of the delegates' vote. In other words, a consensus convention nominee with sixty percent of the convention vote gets the nomination-leaving no room for a party challenger by other means.[2]
The Republican Party claims it has developed this convention-based nomination process over the years to ensure the selection of nominees who will best represent the Party's platform. Because a maximum of two candidates ever participate in a primary election for a given office, these procedures also guarantee that nominees chosen through a state-run primary will have obtained a majority (and not just a plurality) of party members' votes.
The Party's candidate qualification requirements, like its nomination procedures, are designed to make certain that nominees are committed to the Party's platform. All candidates must file a statement certifying that they do not hold a position in any other political party. They must also certify they have read the Party's platform and accept it as the standard by which their performance as an officeholder will be evaluated. Candidates must file these certifications at least thirty days before the convention. If they do not, the Party Chairman announces this failure before the delegates vote.
As an additional security measure against the possibility of unfaithful nominees, the Party's bylaws require nominees to certify they will abide by the Party's nomination procedures. These procedures do not allow for any method to gain the nomination other than competition in the Party's convention.
B. Senate Bill 54
The events leading up to this case began in 2013. According to the Party, and uncontested by Utah, a bipartisan group registered *1248 as the Utah Political Issues Committee Alliance for Good Government, but known popularly as Count My Vote, began lobbying the Party to change its nomination procedures. The group believed the convention method gave "the most power and influence to those with the most extreme views," presumably because only the most fervent and eager undertake the inconvenience of attending a caucus meeting.[3] In its view, this "extremism" was pernicious because the Republican Party is presently the dominant party in Utah and its nominees are favored to win many district- and state-wide elections in the general elections.
To confront this perceived problem with the Republican Party's nominees, or in other words, to "require political party nominees to show a sufficiently broad level of support in order to appear on the general election ballot,"[4] the group repeatedly asked the Party to change its nomination rules. If the Party did not comply, the group threatened to bring a ballot initiative to change the Party's nomination rules against its will. Specifically, it wanted the party to accept absentee votes at conventions and increase the number of votes required for candidates to secure the nomination at a convention. This way, contested nominations would more often be decided with a primary election.
The Republican Party refused. Undaunted, Count My Vote registered its initiative and began efforts to persuade the Utah legislature to enact its desired reforms.
The result was Senate Bill 54. Enacted in 2014, it completely overhauled the requirements political parties must meet to have their nominees placed on Utah's general election ballot. No longer are parties free to select their nomination procedures. "Each registered political party that chooses to have the names of the registered political party's candidates for elective office featured with party affiliation on the ballot at a regular general election," the bill provides, "shall nominate the registered political party's candidates for elective office in the manner described in this section." Utah Code Ann. § 20A-9-403(1)(b).
The bill creates two possible paths for political parties to earn the right to place their endorsements on the ballot-they can be "registered political parties" or "qualified political parties." For registered political parties, participation in the primary is mandatory. "Each registered political party" must "either declare the registered political party's intent to participate in the next regular primary election" or declare that it chooses "not to have the names of the registered political party's candidates for elective office featured on the ballot at the next regular general election." § 20A-9-403(2)(a).
To earn a place on the primary ballot, candidates for a registered political party have one choice only: to collect nomination petitions from "at least 2% of the registered political party's members who reside in the political division" for the office sought. § 20A-9-403(3)(a).
A "qualified political party," by contrast, is allowed to use a convention to select nominees. But this comes at a cost. Qualified political parties must permit delegates to vote by absentee ballot. And they must allow members to seek nomination either by using the party's convention or by collecting a statutorily-designated number of signatures (which varies by office), or both. § 20A-9-101. This is called the "Either or Both" provision.
*1249 Whenever there is at least one candidate chosen by convention and at least one who gained candidacy for the same office by collecting signatures, a qualified political party must participate in a primary election to choose between them. The same is true when there are two or more persons who gained candidacy for the same office by collecting signatures. § 20A-9-409(2). Unlike registered political parties, then, qualified political parties do not necessarily have to participate in the primary election. They only must do so when there are persons who gathered signatures to become candidates.
Candidates who obtain "the highest number of votes" in the primary election, regardless of whether they gained candidacy by convention or signature collection, are deemed "nominated for that office by the candidate's registered political party." § 20A-9-403(5)(a). Parties cannot opt out of this scheme while still retaining their ability to list their affiliation with candidates on the ballot.
And that was not all. As originally passed, Senate Bill 54 also required qualified political parties to allow voters unaffiliated with any party to sign nomination petitions and vote in the party's primary election.
C. The Lawsuits
In 2015, the Utah Republican Party filed suit against Utah's Lieutenant Governor to enjoin the law's application to the Party. The Party concentrated its arguments on the provision requiring it to allow unaffiliated voters to vote in its primary and sign nomination petitions. The district court in Utah held that provision unconstitutional because it unduly burdened the Utah Republican Party's associational rights. Utah Republican Party v. Herbert , 144 F.Supp.3d 1263, 1278 (D. Utah 2015). That judgment is not before us.[5]
The subject of this appeal is the Utah Republican Party's second as-applied challenge to Senate Bill 54. After the first suit, the Party sought clarification from Utah's Lieutenant Governor on whether he would uphold the Party's objections against any candidate who obtained a spot on the primary ballot by using the signature gathering method, which the Party's bylaws did not allow. The Lieutenant Governor responded that his office would not uphold objections to candidates solely because they used the signature-gathering method to gain candidacy. State law, the Lieutenant Governor said, required the Party to allow members to use the signature collection method to become a nominee.
In early 2016, the Party again filed suit, arguing, among other things, that Senate Bill 54 was unconstitutional as applied to the Party because it (1) required the Party to participate in a primary election; (2) required the Party to accept candidates who gathered signatures, in violation of its bylaws; and (3) required an unconstitutionally burdensome number of signatures for qualified political party members to become State House or Senate candidates in the primary.
Upon certification from the district court, the Utah Supreme Court interpreted the Either or Both provision and agreed with the Lieutenant Governor: the law requires the Party to allow members to become nominees by collecting signatures.[6]
*1250 On motions for summary judgment and judgment on the pleadings, the district court entered summary judgment for Utah on all claims, holding the burden these provisions placed on the Republican Party's associational rights was not severe and that the state's interests were substantial enough to justify what little burden existed. The Utah Republican Party has appealed every claim.[7]
I dissent because I believe the Party is correct that, in the circumstances of this case, Utah's interference in the Party's nomination process was unconstitutional. At a minimum, the majority is wrong to conclude Senate Bill 54 is clearly constitutional on this record. There is at least a material dispute of fact as to the burden on the Party's rights and the sufficiency of the state's interests. I concur with the majority that, if Senate Bill 54 is otherwise constitutional, the number of signatures required for State House and Senate candidacies is not unconstitutional.[8]
II. Analysis
The election context is, like so many areas covered by the First Amendment, one of competing rights. And like many situations in which two constitutional principles come head to head, the touchstone of a court's analysis is balancing.
A. Legal Framework
"A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." N.Y. Bd. of Elections v. Lopez Torres , 552 U.S. 196, 202, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (citations omitted) (approving convention nomination process). Indeed, the First Amendment affords "special protection" to "the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." California Democratic Party v. Jones , 530 U.S. 567, 575, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (internal quotation marks and citation omitted; alterations incorporated) (striking down blanket primary law). And this makes sense, as the nomination process is one that "often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." Id.
At the same time, the Constitution explicitly grants states power to select the "Times, Places and Manner of holding *1251 Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and this power is "matched by state control over the election process for state offices." Tashjian v. Republican Party of Connecticut , 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (striking down closed primary scheme).
Our evaluation of First Amendment challenges to state election laws attempts to account for these dueling interests. We "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson v. Celebrezze , 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). We "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id.
In balancing these considerations, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Burdick v. Takushi , 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). When "rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." Id. (internal quotation marks and citation omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." Id. (internal quotation marks and citation omitted).
Put more simply, if the burden on a Party's rights is severe, the state must have compelling interests in the regulation and the regulation must be narrowly drawn to protect those interests. But if the burden is a slight one, important state interests will do. So in this case, we must first consider the magnitude of the law's burden on the Republican Party's associational rights. We then look to whether the state's interests justify that burden. Because we are reviewing a grant of summary judgment as well as a constitutional challenge to a statute, our review is de novo. Ball v. Renner , 54 F.3d 664, 665 (10th Cir. 1995) ; United States v. Ramos , 695 F.3d 1035, 1045 (10th Cir. 2012).
B. The Mandatory Primary and Either or Both Provision
1. The Mandatory Primary provision and the Either or Both provision must be evaluated together.
The Utah Republican Party elaborates separate arguments against (1) the requirement that it participate in a primary to choose between signature-collecting candidates and convention candidates (what it calls the "mandatory primary"), and (2) the requirement that it allow members to become primary election candidates by collecting signatures. But the distinction between the two provisions has little relevance for the purposes of this analysis.
In this as-applied challenge, we evaluate only the provisions that apply to the Utah Republican Party. Here, those are the provisions related to qualified political parties, not registered political parties. While Senate Bill 54 requires registered political parties to participate in the primary, it does not mandate participation of qualified political parties in every case. Instead, qualified political parties only have to participate in the primary when they must decide (1) between signature-gathering candidates and convention-chosen candidates, or (2) between two signature-gathering candidates. See Utah Code Ann. § 20A-9-409(2). If a party's only candidates for an office are chosen at its convention, the party "may, but is not *1252 required to, participate in the primary election for that office." Id. For qualified political parties, then, the requirement to participate in the primary only exists when the signature-gathering path to nomination is used.
In short, the two provisions work as one and cannot be evaluated separately. The question is not whether each provision, in isolation, is constitutional. It is whether this scheme, as a whole, imposes a severe burden on political parties' associational rights, and if so, whether Utah has presented interests compelling enough to justify that burden.
2. The Burden
First, we analyze the burden. Senate Bill 54's effects are further confirmation of the truism that procedure can have enormous substantive repercussions. Not only does the law interfere with the Utah Republican Party's internal procedures, but it also changes the types of nominees the Party will produce and gives unwanted candidates a path to the Party's nomination. By doing so, Senate Bill 54 will inevitably cause divisiveness within the Party and reduce candidate loyalty to the Party's policies. Put together, these consequences severely burden the Party's ability to choose a loyal nominee and, ultimately, its right to define itself and its message. I explain each of these effects in turn.
To begin, Senate Bill 54 "substitute[s]" the Utah legislature's "judgment for that of the party as to the desirability of a particular internal party structure." Eu v. San Francisco Cty. Democratic Cent. Comm. , 489 U.S. 214, 233, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). The law is, in effect, a sort of state-created majority veto over the candidates a party selects through its carefully crafted convention process. And it gives aspiring candidates license to ignore a party's chosen convention procedures without ever having to convince other members to vote to change those procedures.
Such changes to a group's internal nominee selection process affect a group's ability to define itself. That is to say, they change the group's substance . Consider as illustration a Catholic parish. Imagine a situation in which parishioners could collect signatures to challenge their formally selected priest in a congregational election. Would not something substantive about the church have changed? Some might call this procedural reform. But it is more like a Reformation. And the profound importance of leadership selection is not limited to the religious context. Every group's leadership-selection procedures help define its substance-whether hierarchical, uber-democratic, or a mix. This defining choice is, constitutionally, up to each group, unless important state interests are at stake.
Here, the possibility Senate Bill 54 will substantively alter the Utah Republican Party's character is not mere speculation. It is very real. The Utah Republican Party's neighborhood caucus meetings are a communitarian affair-with shared prayer, competition for delegate slots, and local electioneering in support or opposition to candidates and platform recommendations. Under Senate Bill 54, candidates can evade the scrutiny of delegates chosen at these meetings, ignoring the caucus system altogether. In effect, the new procedures transform the Party from a tight-knit community that chooses candidates deliberatively to a loosely affiliated collection of individuals who cast votes on a Tuesday in June. Cf. generally David P. Redlawsk et al., Why Iowa?: How Caucuses and Sequential Elections Improve the Presidential Nominating Process (2010) (arguing that compared to a primary system, the Iowa Caucus encourages greater candidate interaction with voters as opposed *1253 to impersonal campaign advertising).
Second, Senate Bill 54 will likely change the types of candidates the Party nominates. That was precisely the purpose of the law's promoter, Count My Vote.[9] A nomination process filtered through a convention of party regulars will generate different candidates than one accomplished by polling the crowds, among whom are many persons who only nominally associate with the Party. Count My Vote understood that. So does the Party. Whether it makes candidates more moderate, as Count My Vote would have it, or allows for more extreme candidates divorced from the influence of party leadership, the signature- gathering path to nomination will produce "nominees and nominee positions other than those the part[y] would choose if left to [its] own devices." See California Democratic Party v. Jones , 530 U.S. 567, 582, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).[10]
Third, the law violates the Party's right not to associate with an unwanted candidate, a "corollary of [its] right to associate." Id. at 574, 120 S.Ct. 2402. "In no area is the political association's right to exclude more important than in the process of selecting its nominee." Id. at 575, 120 S.Ct. 2402. Yet under this regime, a person who collects signatures can be named the Party's nominee in spite of the fact that he or she has broken the Party's rules regarding how to seek the nomination.
What is more, this scheme allows nominal members or even members hostile to the Party's policies to hijack the Party's platform. So long as a person has means (by fame or fortune) to obtain the requisite number of signatures, he or she can challenge the Party's chosen convention candidate in a primary election. This is no small burden on the Party's right of dissociation, for the spoils of winning the primary are not just a place on the general election ballot (which can be obtained as an unaffiliated candidate). The spoils are a place as the Party's nominee .
As even counsel for the Utah Democratic Party admitted at oral argument, that presents a " [California Democratic Party v. ] Jones problem,"[11] because it is the kind of violation of the freedom not to associate that the Supreme Court condemned in Jones , 530 U.S. 567, 120 S.Ct. 2402 (2000). In that case, California enacted a partisan blanket primary in which all voters, regardless of party affiliation, could vote for any party's nominees. Id. at 569-70, 120 S.Ct. 2402. The Court held that scheme unconstitutional in part because it created the possibility parties would be "saddled with an unwanted, and possibly antithetical, nominee." Id. at 579-81, 120 S.Ct. 2402. Forcing the Party to accept nominees who circumvent the Party's chosen nomination method by appealing to members at the fringes of the Party accomplishes the same thing. It can "saddle" the Party with a nominee who is "antithetical" to the integrity of the Party and its long-term message.
Fourth, this law is likely to cause divisiveness within the Party's ranks. It does not require much foresight to predict that a face-off between a Party's chosen convention *1254 candidate and a signature-gathering insurgent will create rifts among the Party's members. See Paul Pennings & Reuven Y. Hazan, Democratizing Candidate Selection: Causes and Consequences , 7 Party Politics 267, 271 (2001) (discussing this effect for primaries). Fueling intra-party strife endangers an association's very existence almost as much as the inability to exclude. Neither houses divided nor houses without walls can stand.
Fifth, Senate Bill 54 may undermine "the loyalty of candidates to party policies" by "putting candidates in a more independent position vis-à-vis the party and its leadership." Id. "[W]hen their nomination depends on the general electorate rather than on the party faithful," it is less likely that "party nominees will be equally observant of internal party procedures and equally respectful of party discipline." Jones , 530 U.S. at 581, 120 S.Ct. 2402. The same logic applies here.
While only party members can vote in the party's primary, not all members are the same. As the Supreme Court recognized, "the act of formal enrollment or public affiliation with the Party is merely one element in the continuum of participation in Party affairs, and need not be in any sense the most important." Tashjian v. Republican Party of Connecticut , 479 U.S. 208, 215, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). Senate Bill 54 forces the Party to include people who only marginally identify with the party in its nomination decisions. This change will lessen candidates' loyalty to the Party relative to the Party's preferred convention process. A candidate may still formally have to certify agreement with the Party's policies, but faithful delegates are no longer able to hold rogue candidates accountable. And because more than two candidates may end up running in the primary election and split the vote, a person can gain the nomination without a majority of the vote-intensifying the risk that a nominee will be disloyal to the Party platform.
In sum, then, Senate Bill 54 interferes with the Party's internal procedures, changes the kinds of nominees the Party produces (is, in fact, meant to do so[12] ), allows unwanted candidates to obtain the Party nomination, causes divisiveness within the Party, and reduces the loyalty of candidates to the Party's policies. When an association grows large, the risk the association's central message will be lost amidst a sea of nominal members grows too-especially if the group must maintain an inclusive membership policy. Many organizations respond by leaving membership relatively open, but restricting leadership to those who are "true believers," so to speak, in the group's mission. That is what the Party has tried to do. At core, Senate Bill 54's sin lies in taking this option away. In so doing, the law constrains the Party's ability to carry out its most central associational mission-its selection of a faithful nominee.
In spite of the foregoing burdens, the majority opinion concludes the law's overall burden on the Party's associational rights is light. The majority bases this conclusion on five main reasons: (1) its conclusion the law does not regulate the Party's internal process, (2) the Party's continued ability to use traditional advertising channels to endorse the candidate of *1255 its choice, (3) the fact the Party's members still get to choose the nominee, (4) states' ability to regulate "the scope" of party primaries, Maj. Op. at 1231, and (5) the Supreme Court's dicta on the power of states to mandate primaries. Since the Supreme Court's dicta relates to both the Party's burden and Utah's interest, I will address its continued vitality after I discuss the relevant state interests. As for the other reasons, I respectfully suggest they are mistaken.
To begin, the majority holds Senate Bill 54 does not "regulate the party's internal process" because "in fact its grand compromise was to maintain the [Party's] traditional caucus system as a path onto the primary ballot." Maj. Op. at 1232. Yet this observation misses the point. The problem is not that the Party cannot use the caucus system at all. The problem is that the Party cannot use the caucus system as its exclusive means of nomination while still being able to list its endorsements on the ballot. The law requires the Party to allow members to either force a primary race or participate in one by collecting signatures. It is confounding to maintain that such a change does not "regulate the party's internal process."[13]
Next, the majority, like the district court, argues the Party's freedom not to associate with unwanted candidates is sufficiently protected because the Party's leadership can publicly disavow signature-gathering candidates. That cannot be correct. Imagine a political party chooses a "legislator of the month" and gives Senator Sally a badge. Now imagine the government confers that title to Bob as well, and gives him an identical badge. It cannot be the case the party's associational rights have not been trampled upon simply because the party can just tell people that Bob is not the "real" legislator of the month. If that were true, not much would be left of the right not to associate.
In Jones , the "ability of the party leadership to endorse a candidate" did not lessen the burden on "party members' ability to choose their own nominee." 530 U.S. at 580, 120 S.Ct. 2402. So too, the ability to publicly disavow a candidate does not alleviate the forced association imposed on the Party here. Persons who gather signatures are listed as the Party's candidates in the Party's primary ballot and can become the Party's nominee in the general election ballot-all in contravention of the Party's express rules. The ability to publicly deny those candidates is no solution. Indeed, tactical considerations will seriously constrain that ability in practice: the denounced candidate may end up the Party's only nominee in the general election.
The majority further suggests, again like the district court, that there can be no severe burden on the Party so long as nominees are ultimately chosen by the Party's members. The majority argues we must "define the association with the requisite specificity" and proceeds to define the Party as a collection of "roughly 600,000 registered Republicans." Maj. Op. at 1232-34. Because Senate Bill 54 still permits those party members to choose the *1256 nominee, the majority concludes the burden is minimal.
There are two problems with this theory. First, it assumes that nothing of substance changes when nomination is transferred from the party's established convention-based system to a large-scale vote by its members. The error of this line of reasoning has already been explained. Nomination procedures can be substantive, and we err if we consider such a change immaterial.
Second, in order to hold that all is well so long as Party members choose the nominee, the majority defines political parties as merely a collection of members. That is wrong. A political party is more than the sum of its members. Political science literature has long observed parties have several components, only one of which is their membership. See, e.g. , Nathaniel Persily & Bruce E. Cain, The Legal Status of Political Parties: A Reassessment of Competing Paradigms , 100 Colum. L. Rev. 775, 778 (2000) (describing the distinction between the "party-in-the-electorate," the "party-in-the-government," and "professional political workers"). Parties therefore have associational rights that are distinct from those of the individuals that form its membership. The superstructure of the party-its bylaws, customs, and leadership-are protected by the First Amendment too.
If this were not true, then states would have plenary power to alter the internal regulations of political parties, so long as they left ultimate nomination decisions up to party membership. But the Supreme Court has already rejected that theory. It has held that "[f]reedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders" and that "a State cannot substitute its judgment for that of the party as to the desirability of a particular internal party structure." Eu v. San Francisco Cty. Democratic Cent. Comm. , 489 U.S. 214, 229, 232-33, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). And, contrary to the majority's suggestion, these rights are not cabined to "internal activity." See Maj. Op. at 1229. They extend to a party's choice of nominee too. Tashjian dealt with what the majority might call the "external activity" of nomination, and yet the Court still explained that a "Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals , is protected by the Constitution." 479 U.S. at 224, 107 S.Ct. 544 (emphasis added).
What is more, the Supreme Court routinely distinguishes between "the rights of political parties" and those of "their members." See Eu v. San FranciscoCty. Democratic Cent. Comm. , 489 U.S. 214, 219, 231, 232, 233, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) ; id. at 229, 109 S.Ct. 1013 ("These laws directly implicate the associational rights of political parties and their members " (emphasis added) ); Tashjian , 479 U.S. at 217, 107 S.Ct. 544 (evaluating "the burden cast by the statute upon the associational rights of the Party and its members " (emphasis added) ); Timmons , 520 U.S. at 363, 117 S.Ct. 1364 (the statute did not "restrict the ability of the New Party and its members to endorse ..." (emphasis added) ); Jones , 530 U.S. at 581, 120 S.Ct. 2402 ("the ability of the party leadership to endorse a candidate does not assist the party rank and file, who may not themselves agree with the party leadership, but do not want the party's choice decided by outsiders").
In Jones , it is true, the Supreme Court specifically emphasized the fact that party members could not choose nominees. Id. But the Supreme Court did not thereby hold that a party is only defined by its members. In fact, that case was brought because party leadership and bylaws allowed *1257 only party members, and not non-members, to choose the nominee.[14]
Lastly, the majority claims Senate Bill 54 does not unduly burden the Party because it only regulates the "scope of a party primary." See Maj. Op. at 1231 (emphasis in original). It is unclear what is meant by the "scope" of a primary, but Clingman v. Beaver , cited as support for this proposition, only holds that states can restrict the pool of voters who can vote in a state-run primary to a party's members and Independents. 544 U.S. 581, 590, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005). The reasons for that holding-most saliently that "a voter who is unwilling to disaffiliate from another party to vote in [a party's] primary forms little 'association' with the [party]-nor the [party] with him"-are wholly absent in this case. See id. at 589, 125 S.Ct. 2029. And nothing in Clingman 's holding suggests the State has carte blanche authority to reshape a Party's nomination procedures. Indeed, even the state's authority to limit the voter pool for a state-run primary is limited. The Supreme Court has held parties have a First Amendment right to include unaffiliated voters in their party primaries. Tashjian , 479 U.S. at 210-11, 107 S.Ct. 544.
In addition to the reasons the majority provides, the district court proffered one more: Senate Bill 54 does not substantially restrict the Party's associational rights because the Party is not required to become a qualified political party. In other words, the Party can operate as an unregistered political party, using whatever nomination procedures it wants. The only cost, the district court noted, would be to forfeit the ability to have its endorsements printed on the ballot. And because the Supreme Court has said the "First Amendment does not give political parties a right to have their nominees designated as such on the ballot," Washington State Grange v. Washington State Republican Party , 552 U.S. 442, 453 n.7, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008), the district court concluded there was little, if any, burden.
But the district court down-played that even while there may not be a constitutional right to have endorsements printed on the ballot, the "unconstitutional conditions doctrine holds that the government may not deny a benefit to a person on a basis that infringes his ... freedom of speech" or association "even if he has no entitlement to that benefit." Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr , 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (internal quotation marks and citation omitted). For if "the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly." O'Hare Truck Serv., Inc. v. City of Northlake , 518 U.S. 712, 717, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (internal quotation marks and citation omitted).[15]
Even though the Party may not have a right to place its endorsement on the ballot, Utah's condition on printing that endorsement-"change your party rules to better accommodate our preferred kinds of nominees or else lose your spot on the ballot"-is not a constitutional one. And *1258 given the marked electoral disadvantage for the party to go its own way, this condition may even be coercive. The fact that the Party has the choice of being an unregistered political party, then, does not eliminate the law's serious restriction of its First Amendment freedoms.[16]
At bottom, then, none of the reasons either the majority or the district court provide rebut the conclusion that the Party bears a heavy burden under Senate Bill 54. Just because Senate Bill 54 does not engage in what the majority considers more serious intrusions (like a ban on endorsements or forcing the Party to accept nonmember voters in the primary) does not mean the burdens it does impose are not substantial. As the Supreme Court said about the law in Jones , Senate Bill 54 forces the Republican Party "to adulterate [its] candidate-selection process-a political party's basic function." See Jones, 530 U.S. at 568, 120 S.Ct. 2402. When a State forces a party to radically change its candidate selection procedures in the way Utah does here, it places a severe associational burden on that party.
3. State Interests
Having concluded Senate Bill 54 severely burdens the Utah Republican Party's associational rights, we must determine whether Senate Bill 54 is "narrowly tailored to serve a compelling state interest." Clingman v. Beaver , 544 U.S. 581, 586, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005). "In passing judgment" on whether the state's interests are sufficient to justify its regulation, "the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson v. Celebrezze , 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (emphasis added).[17]
In its brief, Utah barely made mention of interests that justify Senate Bill 54. In a single sentence, it listed "managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot"-almost like an afterthought. See Aple. Br. at 34. And at oral argument, Utah simply said the State's purpose was to "strengthen democracy."[18]
Perhaps Utah thought that gesticulating at buzz-words such as "democracy" and "voter participation" would insulate the sufficiency of its interests from scrutiny. It does not. In the context of this case, Utah's three purported interests are insufficient, if not illegitimate.[19]
*1259 The first in its parade of highly generalized interests-"managing elections in a controlled manner"-is almost too nondescript an interest to analyze. Utah has not claimed that elections were conducted in an "uncontrolled manner" before Senate Bill 54. Nor has it explained why the law increases the "controlled manner" of elections now. This appears instead to be a way of saying it has an interest in election regulation in general. But the state's power to regulate elections "does not justify, without more, the abridgment of fundamental rights, such as ... the freedom of political association." Tashjian , 479 U.S. at 217, 107 S.Ct. 544.
Utah's second asserted interest fares worse. Not only is it insufficient; it is likely impermissible. In Jones , the Supreme Court held that while "increasing voter participation" is not "automatically" an illegitimate interest, courts must not evaluate that interest "in the abstract." 530 U.S. at 584, 120 S.Ct. 2402. Instead, courts should ask how that value is being pursued. Id. The Jones Court therefore looked behind this generically phrased interest and found it lacking. In "the circumstances of [that] case," the state's reason for thinking the law would increase voter participation was that "more choices favored by the majority [but not by the party] will produce more voters." Id. at 584-85, 120 S.Ct. 2402. That was "hardly a compelling state interest," the Court explained, "if indeed it [was] even a legitimate one." Id. It is one thing to protect the right to vote; it is quite another to lecture political parties because their internal processes turn off average voters. It is for elections to disclose the truth of that.
Though the state has not explained why it thinks Senate Bill 54 will increase voter participation, there are reasons to think Utah's asserted interest in "increasing voter participation" suffers from the same flaw as that in Jones . As recounted earlier, the advocacy group Count My Vote spearheaded the passage of this legislation, and its express purpose was to change the Party's nomination practices so that nominees would be more representative of the majority of general election voters. It believed "[p]arty delegates ... do not represent the views of average Utahns."[20]
It is uncontested that Senate Bill 54 was designed to accomplish Count My Vote's goals. At oral argument, Utah's counsel admitted that Senate Bill 54 was a "compromise" enacted to address the concerns of the Count My Vote movement.[21] As the majority explained, "it is clear from our review of the record that [Senate Bill 54] was a compromise crafted between the Utah legislature and outside interests," namely, County My Vote. Maj. Op. at 1225.
*1260 Indeed, the bill's sponsor, Senator Bramble, opened his proposal by discussing Count My Vote's efforts to "increase citizen participation"-mentioning the group's appeals for the "dominant party" to change its convention rules.[22] Senator Bramble further explained that encouraging "competitive races between competing philosophies" would increase citizen participation.[23] It is likely, then, that Utah's purpose of "increasing voter participation" is linked to Count My Vote's goal of making party nominees more representative of Utahns as a whole.
This is not a legitimate way to increase voter participation. As the Court said in Jones , the desire to make a party's nominees more "representative" is "nothing more than a stark repudiation of freedom of political association: Parties should not be free to select their own nominees because those nominees, and the positions taken by those nominees, will not be congenial to the majority." 530 U.S. at 582, 120 S.Ct. 2402. If Utahns feel they are not represented by Republican Party office holders, they are free to vote for a different party.[24] But the solution for citizen indifference cannot be to destabilize an existing party in the hopes of galvanizing citizen attention. Nor can it be to force insurgent candidates upon the party, even if they are more representative of the median voter than the candidates the party would choose for itself. And after all, insurgency cuts both ways.
As for Utah's third interest-providing more ways for persons to become party candidates-it is similarly inadequate. This asserted interest is analogous to the state's claim in Jones that it had an important interest in allowing nonmembers to have a voice in a party's nomination. Id. at 583-84, 120 S.Ct. 2402. The Supreme Court rejected that interest because a "nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications." Id. (quoting Tashjian , 479 U.S. at 215-216, 107 S.Ct. 544 ).
The same reasoning applies here. A party member's desire to become a candidate by means other than those the party has adopted is "overborne by the countervailing and legitimate right of the party to determine its own" candidate nomination procedures. While the state may have an interest in making it easier for persons to earn a place as unaffiliated candidates on the general election ballot, it does not have a strong interest in making it easier for them to become the party's candidates on *1261 the party's primary ballot.[25]
The district court also considered a fourth possible state interest-that "[r]equiring a primary" allows the Lieutenant Governor to better perform his statutory duty to " 'ensure compliance with state and federal election laws' more effectively than if nominee selection is left to a party-managed convention process." JA 1171 (quoting Utah Code Ann. § 20A-2-300.6 (2)(b) ). Utah has not even mentioned this interest on appeal, perhaps acknowledging what little connection exists between preventing fraud and Senate Bill 54. Even if one accepts the district court's premise that primaries help prevent fraud, Senate Bill 54 does little to prevent fraud because it does not require a primary in every case: when a qualified political party only has candidates who emerged from its convention, the law does not require the party to participate in a primary.
To summarize, then, Utah has not shown that its "interests make it necessary to burden the plaintiff's rights." See Anderson , 460 U.S. at 789, 103 S.Ct. 1564. It has waved its hands at generalized interests, and that cannot be enough.[26]
4. Supreme Court Case Law
In spite of the state's failure to present a cogent theory of its interests in Senate Bill 54 and the extent to which the bill harms the Party's associational rights, the majority rests its decision on generalized dicta the Supreme Court has repeated, but never examined, since the 1970's. The Court has in fact never been asked to review a state provision squarely imposing a mandatory primary on recalcitrant political parties. Consequently, I respectfully think this reed cannot support the weight placed upon it.
The problem lies in its inception. In 1974, in American Party of Texas v. White , a case about alleged discrimination against minority parties-not mandatory primaries, the Supreme Court said: "It is too plain for argument, and it is not contested here, that the State may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled before the general election by primary election or by party convention." 415 U.S. 767, 781, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Since then, although the Supreme Court has never considered the question presented here, it has repeated variations of this dicta. See New York State Bd. of Elections v. Lopez Torres , 552 U.S. 196, 203, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (addressing challenge to New York's convention system for judicial offices). As recently as *1262 Jones , in which the Court held California's blanket primary unconstitutional, the Court repeated the mantra. 530 U.S. at 572, 120 S.Ct. 2402. It did so even as the logic of its holding cast substantial doubt on the sufficiency of states' interest in mandating a primary over a political party's objection.
These statements suggest states can alter political parties' nomination processes to some extent . But while it is true we are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements," Gaylor v. United States , 74 F.3d 214, 217 (10th Cir. 1996) (emphasis added), we generally do not follow dicta that has been completely assumed and unreasoned. See Tokoph v. United States , 774 F.3d 1300, 1303-04 (10th Cir. 2014), as amended on reh'g (Jan. 26, 2015) ("the 'dicta' do not appear to be of the considered sort that would compel us to reach the suggested conclusion"); United States v. Bd. of Cty. Commissioners of Cty. of Otero , 843 F.3d 1208, 1214 (10th Cir. 2016), cert. denied sub nom. Bd. of Cty. Comm'rs of Otero Cty., New Mexico v. United States , --- U.S. ----, 138 S.Ct. 84, 199 L.Ed.2d 184 (2017) (following dicta because "each statement was fully considered , went to the core of the issue under review, and was the explicit basis for the decision" (emphasis added) ); see also Cent. Virginia Cmty. Coll. v. Katz , 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) ("For the reasons stated by Chief Justice Marshall ... we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.").
Even more significantly, as commentators have noted, an-anything-goes approach to primary election regulations is seriously at odds with the Supreme Court's internal logic in Jones . See, e.g. , Nathaniel Persily, Toward a Functional Defense of Political Autonomy , 76 N.Y.U. L. Rev. 750, 785 (2001) (explaining that Jones follows a long line of Supreme Court cases upholding party autonomy and "the reasoning in Jones would extend to all types of primary systems"); Richard L. Hasen, "Too Plain for Argument?" The Uncertain Congressional Power to Require Parties to Choose Presidential Nominees Through Direct and Equal Primaries , 102 Nw. U. L. Rev. 2009, 2010 (2008) (noting that "cases recognizing the parties' rights to overrule the states on the open or closed nature of political primaries" makes the status of this dicta "uncertain"). That is because one of the constitutional flaws identified in Jones -the alteration of the kinds of nominees a party chooses-is present in most primaries. See Samuel Issacharoff, Private Parties with Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition , 101 Colum. L. Rev. 274, 274-275, 282 ; Pennings, Democratizing Candidate Selection , supra , at 269.
I therefore doubt the Supreme Court was laying down the law for all time in all contexts, including the intrusion mounted here by the state of Utah. At one time, perhaps, the necessity of primaries may have seemed obvious. Primaries were, as is well known, part of progressive reform to combat corruption-laced and "smoke-filled" backrooms, where party bosses supposedly ruled with autocratic quid pro quos. See Lopez Torres , 552 U.S. at 205-06, 128 S.Ct. 791 ; Diana Dwyre, Political Parties and Campaign Finance: Challenges and Adaptations, in The Parties Respond: Changes in American Parties and Campaigns 181, 185-86 (Mark D. Brewer & L. Sandy Maisel eds., 2013). Those were times when the *1263 party patronage system was strong, see Elrod v. Burns , 427 U.S. 347, 353, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (describing this system), when parties more or less controlled candidates publicity, Diana Owen, Political Parties and the Media: The Parties Respond to Technological Innovation, in The Parties Respond , supra , at 237, 240, and when parties held the pocketbook, Dwyre, supra , at 181-185.
But that power is a gone-by era. The advent of the civil service system destroyed the party spoils system. Elrod , 427 U.S. at 353, 96 S.Ct. 2673. From broadcast television in the mid-twentieth century to social media today, the changed media environment has wrested candidate publicity from parties' hands. Marc J. Hetherington & Bruce A. Larson, Parties, Politics, and Public Policy in America 102-104, 252 (11th ed. 2010). And parties have lost their grip on a candidate's cash. Dwyre, supra , at 206-07. As one commentator has put it, those "great urban machines of generations past have practically disappeared." Hetherington, supra , at 251. And while the "classic functions" of parties "are recruitment, nomination, and campaigning ... today's parties no longer dominate any of these activities." Id. at 292. Indeed, many of these functions have been farmed out to SuperPacs only loosely affiliated with political parties. See Hetherington, supra , at 26, 37, 110, 136-37, 141.
At the same time, experience has called into question the Supreme Court's premise that primaries-the main democratizing device for nominations in use today-are "an ideal forum in which to resolve" intraparty "feuds." See Eu , 489 U.S. at 227, 109 S.Ct. 1013. See generally Stephen E. Gottlieb, Rebuilding the Right of Association: The Right to Hold a Convention as a Test Case , 11 Hofstra L. Rev. 191 (1982) (arguing primaries can generate disorder and undermine First Amendment rights of parties). Primaries tend to weaken party cohesiveness, alter a party's candidate mix, and change a party's political messages. Pennings, Democratizing Candidate Selection , supra , at 269, 271; Hetherington, supra , at 250; Issacharoff, Private Parties with Public Purposes , supra , at 274. Primaries have not, moreover, lived up to their hype of equalizing the playing field among candidates and increasing voter engagement. Evidence suggests primaries do almost nothing to weaken incumbent advantage. Hetherington, supra , at 79-80. And as for increasing voter participation in the nomination process, primaries have been a dud. Turnout for primary elections is consistently dismal. Id.
This new context matters. The whole premise of the Anderson / Burdick test is to balance the associational burdens placed on political parties with a state's interest in maintaining "fair and honest" elections. See Burdick , 504 U.S. at 433, 112 S.Ct. 2059 (quoting Storer v. Brown , 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) ). The much-reduced power parties wield in today's world suggests the burden of interference with their ability to nominate the candidate of their choice is greater and the state's interest in interfering is far lower than it was at an earlier time.
When circumstances have changed so drastically, it is not enough to rely on the fact that the Supreme Court once assumed the First Amendment balance clearly favored the state. In these as-applied challenges, we must evaluate the associational burden in light of facts on the ground. That is how we typically approach election law-related challenges and other First Amendment cases.
When aspiring candidates challenge the requirements they face to be listed on the *1264 ballot, for example, we do not look at whether a variant of that isolated provision was held constitutional in 1950, 1990, or even last year. Rather, "to assess realistically whether the law imposes excessively burdensome requirements ... it is necessary to know other critical facts." See Storer v. Brown , 415 U.S. 724, 738, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). We thus look to whether the entire election mechanism, in its "totality," unduly impairs a person's ability to become a candidate. Arutunoff v. Oklahoma State Election Bd. , 687 F.2d 1375, 1379 (10th Cir. 1982). The Supreme Court has looked, for instance, to whether it is feasible, on the ground, for candidates to collect the number of signatures a state requires for a place on the ballot. See American Party of Tex. v. White , 415 U.S. 767, 786-87, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) ("Given that time span, signatures would have to be obtained only at ... four signatures per day for each 100 canvassers ... Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other....").
Similarly, when evaluating time, place, and manner restrictions on speech, we do not focus solely on the prohibition at issue. We look at whether there are "ample alternative channels for communication." Ward v. Rock Against Racism , 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence , 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ). Simply put, we assess how burdensome the regulation really is in the real world.
Consider the Supreme Court's explicit holding in a facial challenge to Indiana's voter identification law. Crawford v. Marion Cty. Election Bd. , 553 U.S. 181, 185-89, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). The Court found that Indiana had sufficiently alleged state interests in ballot integrity that outweighed competing burdens on the right to vote. Id. at 191-97, 202-203, 128 S.Ct. 1610. The Court held the " 'precise interests' advanced by the State [were] therefore sufficient to defeat petitioners' facial challenge to" the law. Id. at 203, 128 S.Ct. 1610. Yet despite this clear statement, when confronted with as-applied challenges, lower courts have had no problem reassessing the severity of the burden on voters based on real world evidence.[27] The same is true here.
And attention to facts on the ground is especially important when we are dealing with the associational rights of political parties. Parties are an indispensable part of our democracy, having come into being almost immediately after the creation of the republic. Jones , 530 U.S. at 574, 120 S.Ct. 2402. "Representative democracy in any populous unit of governance is unimaginable"
*1265 without parties. Id. Indeed, no large democracy has been able to operate without them. Nicol C. Rae, The Diminishing Oddness of American Political Parties, in The Parties Respond , supra , at 25, 25. Parties perform the essential task of aggregating disparate interests into digestible options on the ballot. By doing so they provide an important heuristic for voters and reduce costs for legislators to organize around policies. Persily, The Legal Status of Political Parties , supra , at 787. And by brokering between the varied interests in the coalition, parties make it possible for a large number of interests-especially minorities-to have a voice. See id.
As Justice O'Connor explained in her concurrence in Davis v. Bandemer , "[t]here can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government." 478 U.S. 109, 144-45, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). "The preservation and health of our political institutions, state and federal, depends to no small extent on the continued vitality of our two-party system, which permits both stability and measured change." Id.
In light of the important function political parties serve in our Republic, we should be wary of burdens on their associational rights at a time when they are, in many respects, already weakening. In most states, it is true, the major political parties still favor the primary election. Persily, Toward a Functional Defense of Political Autonomy , supra , at 786. But the case for the constitutionality of forcing political parties to engage in selection-by-primary against their will is, today, far more suspect. Indeed, mandatory primaries are anomalous among the world's democracies, and have not, despite the oft-repeated myth, resulted in what most reformers intended.[28] Under these circumstances, we should not rely on conclusory assertions. If we permit the kind of associational degradation Senate Bill 54 effects on parties, we may find instead of "stability," populism, and instead of "measured change," extremism.
I would therefore hold Senate Bill 54's primary provisions unconstitutional.
C. The Signature-Gathering Provision
The Utah Republican Party also claims the number of signatures Senate Bill 54 requires qualified political party members to collect to become candidates for the State House or Senate are unconstitutionally burdensome. Because the majority holds the rest of Senate Bill 54 is constitutional, it also decides this question. I agree with the majority that, if the rest of the scheme is constitutional, the quantities of signatures required are not unconstitutional.
The Utah Republican Party argues the percentage of eligible signers a candidate must obtain signatures from for State House and Senate far exceeds the five-percent "safe harbor" under Jenness v. Fortson , 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). See also Storer , 415 U.S. at 739, 94 S.Ct. 1274. The number of signatures required-1,000 for State House, 2,000 for State Senate-range from *1266 6% to 57% of the eligible signers in each district.[29]
But these percentages are not the end of our analysis. The Supreme Court's "ballot access cases ... focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." Clements v. Fashing , 457 U.S. 957, 964, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." Id. (internal quotation marks and citation omitted).
Accordingly, we look at the "the practical effect of the election laws of a given state, viewed in their totality." Arutunoff v. Oklahoma State Election Bd. , 687 F.2d 1375, 1379 (10th Cir. 1982). This "totality" approach is in agreement with the Second Circuit's approach in LaRouche v. Kezer , 990 F.2d 36 (2d Cir. 1993). When there is a constitutional method of becoming a candidate on the ballot, an additional method-even if difficult to use-is not unconstitutional unless it is irrational. See id. at 38-39 & n.1.
Senate Bill 54 provides two paths for a qualified political party member to obtain a place on the primary ballot. One is the party convention. The other is signature-gathering. Because all agree that the convention method is constitutional on its own, the signature-gathering route only increases the ways a candidate can earn a slot on the ballot. Accordingly, even if it is difficult to use, it does not unfairly burden political opportunity.
Contrary to the Utah Republican Party's contention, there is also no indication that the numbers chosen are irrational. The state might think that one or two thousand supporters is in itself a "significant modicum of support" meriting a candidate's placement on the ballot, regardless of the percentage of eligible signers it represents. See Jenness , 403 U.S. at 442, 91 S.Ct. 1970. Or the state may want to incentivize use of the party convention for State House and Senate candidacies. Either way, the signature-gathering requirements do not violate the Constitution.[30]
III. Conclusion
Senate Bill 54 attempts to change the substance of the Utah Republican Party under the guise of the state's authority to regulate electoral procedure. Like California in Jones , Utah had the "intended outcome" of "changing the [Party's] message" and "favor[ing] nominees with 'moderate' positions." See Jones , 530 U.S. at 580-82, 120 S.Ct. 2402. There is "no heavier burden on a political party's associational freedom." Id.
In contrast to these heavy burdens, the State's asserted interests are vague and *1267 even impermissible. Utah alleged no evidence of corruption or fraud. And this is not a case in which the Party has disenfranchised some protected segment of the citizenry in its processes. See, e.g. , Smith v. Allwright , 321 U.S. 649, 650, 64 S.Ct. 757, 88 L.Ed. 987 (1944). To the contrary, the Party uses a convention system that gathers delegates from around the state who are chosen at caucus meetings open to all of the public without any qualification other than Party membership.
The background of this case should caution us as to the perils of allowing states to impose procedural changes of this magnitude on unwilling political parties. After the Utah Republican Party repeatedly rebuffed requests to change its nomination procedures, the unsuccessful reformers simply went to the state legislature and changed the Party's procedures by force of law. Allowing this collateral attack on party rules to be a run-of-the-mill part of the political process invites leaders "to enlist and rely on state law as the primary vehicle for party governance, largely relieving these leaders of any need to secure the support or acquiescence of party members to a chosen course." See Ellen D. Katz, Barack Obama, Margarita Lopez Torres, and the Path to Nomination , 8 Election L. J. 369, 379 (2009).
Perhaps it would be wise for the Utah Republican Party to change its nomination procedures. And maybe it will. Parties are not impervious to change. Change happens to parties constantly, sometimes from within and sometimes from without. But such change is not for legislatures to impose. At least not unless they have clearly spelled out, compelling interests.
For the foregoing reasons, I respectfully dissent with respect to the Either or Both and mandatory primary scheme and concur with respect to the signature-gathering provision.

See Paul MacMahon, Proceduralism, Civil Justice, and American Legal Thought , 34 U. Pa. J. Int'l L. 545, 594-610 (2013) ; see also Thurman W. Arnold, The Role of Substantive Law and Procedure in the Legal Process , 45 Harv. L. Rev. 617, 643 (1932).

This did not mean the Party never participated in state-run primaries. From 2002 to 2010, a number of state house and senate districts participated in a Republican primary during each primary election cycle. See Utah Lieutenant Governor's Office, Election Results , https://elections.utah.gov/election-resources/election-results (last visited Feb. 21, 2018). Nor did it mean conventions were an incumbent-protection machine. See David Catanese, Sen. Bennett loses GOP Nomination , Politico (May 10, 2010), https://www.politico.com/story/2010/05/sen-bennett-loses-gop-nomination-036960 (noting how outsiders beat incumbent Senator at the Party's convention to gain spots on primary ballot).

See Count My Vote, Why Change Utah's Election System? , http://www.countmyvoteutah.org/facts (last visited Feb. 21, 2018).

See Count My Vote, Citizens' Initiative Petition 4-5 (2013), http://www.countmyvoteutah.org/s/Submitted-Initiative-Application-duv3.pdf.

The Utah Republican Party argues judicial estoppel prevents Utah from asserting its interpretation of the Either or Both provision in this case. But a review of the record unambiguously demonstrates that Utah's position in the first lawsuit is not at odds with its position in this case. See JA 1143.

Utah Republican Party v. Cox , 373 P.3d 1286, 1287 (2016). The Utah Supreme Court declined to address what the consequences would be if the Republican Party disobeyed Senate Bill 54 by, for example, expelling a member who used the signature collection route to candidacy. Id. at 1288-89.

The Utah Democratic Party-which intervened below-also cross-appealed on various grounds, but it cannot do so because it voluntarily dismissed its claims below. Coffey v. Whirlpool Corp. , 591 F.2d 618, 620 (10th Cir. 1979).

Utah argues (by incorporating the Utah Democratic Party's argument) that the Utah Republican Party's claims are barred by issue preclusion, claim-splitting, and claim preclusion because of its first lawsuit. After carefully reviewing the record, it appears only the claim preclusion argument can possibly have merit. It is clear from the record that claim preclusion does not apply to the Republican Party's claims against the Either or Both provision or the signature-gathering provision. JA 582, 584-85. But the Republican Party's first lawsuit did squarely bring up a discriminatory animus claim. See JA 57-60, 77-78. And the Party had all the information it needed to make that claim at that time. Consequently, the Party's discriminatory animus claim is barred by claim preclusion. Lenox MacLaren Surgical Corp. v. Medtronic, Inc. , 847 F.3d 1221, 1239 (10th Cir. 2017). Although we normally disfavor incorporation by reference, cf. 10th Cir. R. App. P. 28.4, I would hold the district court erred by not so deciding.

See, e.g. , JA 57-59; Count My Vote, Public Hearing Presentation , http://www.countmyvoteutah.org/public-hearing-presentation (last visited Feb. 21, 2018) (Arguing the caucus system made "candidates more extreme, and amplified non-competitive elections"); id. ("Delegate Priorities Don't Represent Utah Voters").

As I discuss further below, there is no reason to believe that grass roots, insurgent candidates are more likely to be the more centrist nominee. One only need look around at a few recent elections at every level to know that claim is dubious.

Oral Argument at 16:40-17:45.

See Count My Vote, Why Change Utah's Election System? , http://www.countmyvoteutah.org/facts (last visited Feb. 21, 2018) (arguing the convention system gives "the most power and influence to those with the most extreme views"); Senate Day 24, 2014 53:00-60:00, http://le.utah.gov/jsp/jdisplay/billaudio.jsp?sess=2014GS & bill=sb0054&Headers=true (last visited Feb. 22, 2018) (Senator Bramble stating that Senate Bill 54 addressed Count My Vote's concerns and attempted to increase "competitive races between competing philosophies" in state primaries).

Because Senate Bill 54 was born of a "Great Compromise" between Count My Vote and a mostly Republican legislature, the majority also suggests the law actually helps the Party. Maj. Op. at 1235-36 n.15. But why should it matter the bill was a compromise the Utah legislature entered into to avoid a ballot initiative? Whether or not the legislature was trying "to save the [Party] from undertaking a course of conduct destructive of its own interests"-which in any event the state is not allowed to do, Tashjian , 479 U.S. at 224, 107 S.Ct. 544 -Senate Bill 54 coerces the Party just as much as an initiative would have. And, more to the point, the Party and the Republican members of Utah's legislature are not entirely the same thing or necessarily aligned on every issue.

This conclusion does not entail, as the majority suggests, holding that "the rights and interests of the association extend only to the rights and interests of the party leadership." See Maj. Op. at 1233. It merely entails an acknowledgment that the First Amendment protects the rights of a political party's superstructure as well as the rights of party members.

Though the Party has not expressly argued the unconstitutional conditions doctrine, the doctrine's applicability is obvious from the record.

The district court also concluded that because the Utah Republican Party's bylaws do not expressly prohibit signature gathering, Senate Bill 54 did not much burden the Party. But this is an unreasonable interpretation of the Party's bylaws, which provide for one means of nomination and one only: the convention. Thus, when the Party asked candidates to comply with its written procedures, it necessarily excluded other paths to the nomination.

As the following discussion makes clear, I find Senate Bill 54 unconstitutional even under the more lenient Anderson /Burdick balancing test.

Oral Argument at 34:10.

The majority cites several Supreme Court cases upholding similar state interests. See Maj. Op. at 1236. But none of those cases accepted the state interests without an in-depth exploration of their reasonableness in the case at hand. See Crawford v. Marion Cty. Election Bd. , 553 U.S. 181, 191-97, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (engaging in in-depth analysis of the state's proffered interests); Clingman v. Beaver , 544 U.S. 581, 593-97, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (same); Timmons v. Twin Cities Area New Party , 520 U.S. 351, 364-68, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (same).

See Count My Vote, Why Change Utah's Election System? , http://www.countmyvoteutah.org/facts (last visited Feb. 21, 2018); see also Count My Vote, Press Release: Education Groups Endorse, Rally Behind Count My Vote , http://www.countmyvoteutah.org/education-community-endorses-rallies-behind-count-my-vote (last visited Feb. 21, 2018) (publicizing another group's endorsement, stating that "The majority of all Utah voters rank education as their highest priority, but Republican delegates are more concerned with guns, grazing, and getting the U.S. out of the United Nations"); Count My Vote, Press Release: Utahns for Ethical Government Endorses Count My Vote , http://www.countmyvoteutah.org/utahns-for-ethical-government-endorses-count-my-vote (last visited Feb. 21, 2018) (publicizing another group's endorsement, denigrating "caucuses" as "neighbor-inflicted litmus tests, to see if someone is sufficiently 'right-thinking' to be selected as a convention delegate in a problematic caucus voting process").

Oral Argument at 25:00.

Senate Day 24, 2014 53:00, http://le.utah.gov/jsp/jdisplay/billaudio.jsp?sess=2014GS & bill=sb0054 & Headers=true (last visited Feb. 22, 2018).

Senator Bramble also acknowledged that Count My Vote's proposed language had been incorporated into the bill. Senate Day 24, 2014 55:00-1:00:01, http://le.utah.gov/jsp/jdisplay/billaudio.jsp?sess=2014GS & bill=sb0054 & Headers=true (last visited Feb. 22, 2018). He further described certain provisions as "consistent with the original intent of the Count My Vote proponents" and "consistent with the underpinnings" of the Count My Vote movement." Id. A number of other senators also mentioned Count My Vote and its purposes when discussing the purposes of the bill. Id. at 1:00:00-1:40:00.

This is, in fact, already happening. See Lee Davidson, New centrist party forms in Utah to attract disaffected Republicans, Democrats , Salt Lake City Tribune (May, 24, 2017), http://archive.sltrib.com/article.php?id=5317869 & itype=CMSID (noting that Republican and Democratic voters who feel disenfranchised have recently formed a new party in Utah).

In deciding Utah has an interest in giving Party members "writ large" another way to gain the nomination, the majority paints party members as pitted against a separate (and even antagonistic) group of "party bosses." See Maj. Op. at 1234, 1235-36 n.15. Yet there is no reason to suppose a Great Wall between the two. Any Party member is free to become more involved in the Party's internal workings. If Party members want a signature-gathering route to nomination, they can surely rally for that change to the Party's bylaws, as is the case in many states. And as mentioned earlier, were a cabal to truly shut out the voices of ordinary members, members are free to quit, to form a new party, to cast their votes elsewhere. In the long run, there is more democratic accountability for political parties than the majority admits. The history of party presidential nomination processes demonstrates the adaptability of parties and their convention/delegate schemes.

Though I have applied strict scrutiny, I think the foregoing shows Utah's interests do not meet the lesser "important interests" form of scrutiny either. See Burdick v. Takushi , 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

See N. Carolina State Conference of NAACP v. McCrory , 831 F.3d 204, 214, 232 (4th Cir. 2016), cert. denied sub nom. North Carolina v. N. Carolina State Conference of NAACP , --- U.S. ----, 137 S.Ct. 1399, 198 L.Ed.2d 220 (2017) (holding voter ID law unconstitutional in light of the record in that case); Veasey v. Perry , 71 F.Supp.3d 627, 679, 707 (S.D. Tex. 2014), vacated in part on other grounds , Veasey v. Abbott , 796 F.3d 487 (5th Cir. 2015), on reh'g en banc , 830 F.3d 216 (5th Cir. 2016), and aff'd in part, vacated in part, rev'd in part sub nom. Veasey v. Abbott , 830 F.3d 216 (5th Cir. 2016) (holding voter ID law unconstitutional because there were "substantial differences in the evidentiary record" making Crawford 's holding inapplicable); Frank v. Walker , 17 F.Supp.3d 837, 845, 863 (E.D. Wis.), rev'd , 768 F.3d 744 (7th Cir. 2014) (the district court held voter ID law unconstitutional because the record was different from that in Crawford but was reversed on the grounds that the record in Crawford was too similar).

See Richard Pildes, Two Myths About the Unruly American Primary System , Washington Post (May 25, 2016), https://www.washingtonpost.com/news/monkey-cage/wp/2016/05/25/two-myths-about-the-unruly-american-primary-system/?utm_term=.b06a00d53dc6.

These high figures are the result of the first lawsuit. Senate Bill 54 used to allow unaffiliated voters to sign candidacy petitions. When the district court held that provision unconstitutional, the Utah Republican Party chose only to allow its own members to sign petitions, drastically reducing the number of eligible signers in each district. This does not affect the outcome one way or the other. See Illinois State Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 187, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("Historical accident, without more, cannot constitute a compelling state interest.").

The foregoing analysis does not, however, foreclose an as-applied equal protection or due process challenge by an aspiring candidate disadvantaged by these signature-gathering requirements.