990 F.2d 36
 Lyndon H. LAROUCHE, Jr., Eugene McCarthy, Kevin Irwin,
Virginia Irwin, Anthony Longo, Jabir Jawwaad,
Timothy B. Brown, Laurence P. Nadel, and
Hope Crescione,
Plaintiffs-
Appellants-
Cross-Appellees,
v.
Pauline R. KEZER, Secretary of the State of Connecticut,
Defendant-Appellee-Cross-Appellant.
 Nos. 1577, 1578, Dockets 92-7263, 92-7309.
 United States Court of Appeals,
Second Circuit.
 Argued June 9, 1992.
Decided March 31, 1993.
 
 Martin Margulies, Bridgeport, CT (Martha Stone, JoNel Newman, Connecticut Civil Liberties Union Foundation, Hartford, CT, of counsel), for plaintiffs-appellants-cross-appellees.
 Daniel R. Schaefer, Asst. Atty. Gen., Hartford, CT, (Richard Blumenthal, Atty. Gen. for the State of CT, Hartford, CT, of counsel), for defendant-appellee-cross-appellant.
 Before: CARDAMONE, WINTER and MAHONEY, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal questions the constitutionality of Connecticut's two ballot-access laws. One law, Conn.Gen.Stat. § 9-465(a) (1989) (the "media recognition" statute), directs the Connecticut Secretary of State to place on the state's presidential primary election ballot those candidates who are "generally and seriously recognized according to reports in the national or state news media." The other, Conn.Gen.Stat. §§ 9-465(b), 9-467 to 469 (the "petition alternative"), enables candidates who fail the media recognition test to appear on the ballot if, within the next fourteen days, they collect signatures from one percent of their party's registered voters.
 
 
 2
 The appellants are Lyndon H. LaRouche, Jr. and Eugene McCarthy, candidates for the 1992 Democratic nomination for president, and various Connecticut citizens who supported them. This action was brought after Connecticut's Secretary of State, appellee Pauline R. Kezer, refused to place either LaRouche or McCarthy on the primary election ballot. Neither attempted to collect signatures under the petition alternative. Appellants claim that Kezer's decision and the ballot-access laws violate the First and Fourteenth Amendments.
 
 
 3
 After a trial, Judge Dorsey upheld the petition alternative statute as constitutional. LaRouche and McCarthy appealed. We affirm that ruling. However, Judge Dorsey struck down Connecticut's "media recognition" statute as unconstitutionally vague. Kezer cross-appeals from this ruling, and we reverse. Because the petition alternative standing alone passes constitutional muster, it follows a fortiori that the media recognition test, which operates in tandem with the petition alternative to broaden the opportunities to get on the ballot, is also constitutional.
 
 BACKGROUND
 
 4
 LaRouche, a candidate since 1976, is currently serving a fifteen year sentence for tax and mail fraud. On August 20, 1991, Secretary Kezer informed the LaRouche campaign that she would place on the ballot those candidates who were "generally and seriously advocated or recognized according to reports in the national or state news media." The campaign responded by sending Kezer some 500 clippings of LaRouche's press coverage, asking that his name be placed on the ballot. While some clippings dealt with the LaRouche candidacy, others focused on unrelated issues--e.g., "LaRouche loses in appeals court"; "Turkish Leader Meets LaRouche by Mistake"; "Lyndon LaRouche tells of life with Jim Bakker"--and indicated no significant public support.
 
 
 5
 McCarthy's involvement in presidential elections stretches back to 1968. On December 30, 1991, Kezer notified the McCarthy campaign of Connecticut's ballot procedures. McCarthy submitted no evidence of public support before the deadline but simply presented his name for certification.
 
 
 6
 In applying the media recognition statute, Kezer and her staff examined media materials submitted by the candidates and monitored for approximately one year election reports in newspapers, Time and Newsweek magazines, and radio and television news broadcasts. On January 24, 1992, Kezer placed nine of the thirty-nine announced candidates on the ballot. Among these nine were several long shots, including Republican David Duke and Democrat Larry Agran. However, LaRouche and McCarthy were not given places on the ballot because Kezer considered neither "a seriously advocated candidate."
 
 
 7
 Although unsuccessful under the "media recognition" statute, LaRouche and McCarthy had the option of pursuing the petition alternative. Either might have qualified for a place on the ballot by collecting 6,518 signatures from registered Democrats by February 7. Conn.Gen.Stat. §§ 9-465(b), 9-467 to 469. Neither candidate attempted to gather the signatures but instead wrote to Kezer asking her to reconsider. After failing to convince her, they and their supporters brought suit in the District of Connecticut, seeking declaratory and injunctive relief. Their complaint alleged, inter alia, that: (i) the media recognition statute was unconstitutionally vague; (ii) the petition alternative placed impermissible burdens on ballot access and the right to vote; and (iii) Kezer had discriminated against the candidates in refusing to place them on the ballot.
 
 
 8
 Judge Dorsey struck down the media recognition statute on vagueness grounds. He held that the statute contained neither objective nor quantifiable standards, used terms that were "the epitome of vagueness," and permitted public officials unreviewable discretion. He permanently enjoined Kezer from enforcing the media recognition procedure set forth in Section 9-465(a). However, he upheld the petition alternative as not so burdensome as to render the method "meaningless." Because appellants had not availed themselves of the petition alternative, Judge Dorsey entered judgment for appellee and denied appellants' request to enjoin distribution of ballots without the names of LaRouche and McCarthy. They appealed. Kezer cross-appealed from the judgment holding the media recognition statute unconstitutional.
 
 
 9
 Appellants sought a stay, an injunction pending appeal, and an expedited appeal. On March 10, 1992, we granted both the stay and the injunction pending appeal. Kezer revised the ballot to include appellants.
 
 DISCUSSION
 
 10
 On appeal, LaRouche and McCarthy have abandoned their discrimination claims, which were not ruled upon by Judge Dorsey, as in their view moot. We therefore address only their challenge to the constitutionality of Connecticut's statutory scheme. We uphold both the media recognition and petition alternative statutes.
 
 
 11
 Our disagreement with the district court regarding the media recognition statute concerns its separate analysis of each statutory method for getting on the ballot. It thus examined the media recognition route as though it stood alone and found it constitutionally wanting. It then examined the petition alternative as though it stood alone and concluded that it passed constitutional muster. However, if the petition alternative would be constitutional standing alone, the additional method of a media recognition test is not in any sense an unconstitutional burden. To the contrary, because it is not constitutionally required, the media recognition test, whether or not vague, increases the opportunities to get on the ballot and reduces the burdens on candidates.[1] Indeed, the injunction entered by the district court reduced rather than increased the opportunities for ballot access. In short, if the district court was correct about the constitutionality of the petition alternative standing alone, then the media recognition statute is a fortiori valid as an additional means of ballot access.
 
 
 12
 The district court analyzed each statute separately because it believed that "a totality approach ... is inapplicable where a candidate is not 'absolutely and validly barred from the ballot by one provision of the laws.' Thus, Connecticut's two methods of ballot placement processing will be screened separately." LaRouche v. Kezer, 787 F.Supp. 298, 302 (D.Conn.1992) (quoting Storer v. Brown, 415 U.S. 724, 737, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974)). However, this was a misapplication of Storer. The pertinent section of the Storer opinion concerned a very different question than confronts us here. The California law at issue in Storer denied a ballot position to any independent candidate who, within one year prior to the immediately preceding primary election, had a registered affiliation with a qualified political party. Storer, 415 U.S. at 726, 94 S.Ct. at 1277. The Storer Court held this to be a valid restriction and ruled that two of the plaintiffs were therefore "barred from the ballot as a result of its application." Id. at 736, 94 S.Ct. at 1282. Because the plaintiffs were barred from the ballot by the provision in question, whether or not they could meet the requirements of other California election laws, "there was no ... reason" in the Court's view to consider the validity of California election laws in their totality. Id. at 737, 94 S.Ct. at 1282.
 
 
 13
 In contrast, neither appellant in the instant matter was declared per se ineligible by any Connecticut law; their failure to obtain ballot access resulted solely from their failure to meet the requirements of either the media recognition or the petition statute. The totality approach thus applies. See Burdick v. Takushi, --- U.S. ----, ---- - ----, 112 S.Ct. 2059, 2064-65, 119 L.Ed.2d 245 (1992) (burdens of ban on write-in votes assessed in light of state's comprehensive election code); Storer, 415 U.S. at 738-40, 94 S.Ct. at 1283-84 (constitutionality of state petition requirement determined by interaction with other election statutes); American Party of Texas v. White, 415 U.S. 767, 786-87, 94 S.Ct. 1296, 1308-09, 39 L.Ed.2d 744 (1974) (constitutionality of statute limiting petition time determined in conjunction with statute specifying total number of signatures required). Under the totality approach, if either alternative would be constitutional standing alone, the other must be viewed as broadening the opportunities for ballot access and is a fortiori constitutional.
 
 
 14
 We agree with the district court that the petition alternative is constitutional. The power of states to regulate elections and the limits on that power are derived from government's compelling interest in structuring elections in a way that avoids "confusion, deception, and even frustration of the democratic process." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). Unlimited access to the ballot would inevitably produce confusion, and states may thus limit the number of candidates that appear on the ballot. Storer, 415 U.S. at 732, 94 S.Ct. at 1280. This limits ballot access for some, but prevents:
 
 
 15
 the clogging of [a state's] election machinery, avoid[s] voter confusion, and assure[s] that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.... Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.
 
 
 16
 Bullock v. Carter, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972).
 
 
 17
 States may therefore winnow the field by requiring candidates to produce evidence of public support as a means of avoiding a ballot that is complex and confusing but does not enhance the democratic nature of our political processes. Jenness, 403 U.S. at 442, 91 S.Ct. at 1976. Of course, if state regulations severely burden a candidate's access to the ballot, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " Burdick, --- U.S. at ----, 112 S.Ct. at 2063 (quoting Norman v. Reed, --- U.S. ----, ----, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). If the burden is not severe, but imposes only "reasonable, nondiscriminatory restrictions," the statute is valid as long as the states' interests are important. Burdick, --- U.S. at ---- - ----, 112 S.Ct. at 2063-64 (quoting Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983)). Connecticut's petition alternative thus does not unduly burden ballot access by requiring candidates to show a minimum amount of public support. First, it requires signatures from only one percent of the party's registered voters. Facially, this is not a severe burden and has even been characterized as lenient in similar contexts. American Party of Texas, 415 U.S. at 783 n. 15, 94 S.Ct. at 1307 n. 15. Indeed, the Supreme Court has upheld signature requirements as high as five percent of the relevant pool of voters. Jenness v. Fortson, 403 U.S. at 442, 91 S.Ct. at 1976.
 
 
 18
 Second, Connecticut's petition statute is free from many restrictive features found elsewhere. For example, party members may sign more than one petition, thus preserving the pool of potential signatories from diminution by competing candidates. Cf. American Party of Texas, 415 U.S. at 785, 94 S.Ct. at 1308. Candidates are also not required to pay filing fees, Conn.Gen.Stat. §§ 9-465 to 9-469. Like the petition requirements upheld in Jenness,
 
 
 19
 the way is open. For [the state] imposes no suffocating restrictions whatever upon the free circulation of nominating petitions. A voter may sign a petition even though he has signed others.... The signer of a petition is not required to state that he intends to vote for that candidate at the election.... [and] a person who was not even registered at the time of the previous election [is also eligible.] No signature on a nominating petition need be notarized.
 
 
 20
 Jenness, 403 U.S. at 438-39, 91 S.Ct. at 1974.
 
 
 21
 Third, although Connecticut's two-week requirement is more strict than the temporal limits in many states, its burden can be shouldered by a candidate who has support from a relatively small number of interested supporters. In Storer, the Supreme Court considered a California ballot-access law requiring independent candidates to collect, within twenty-four days, signatures totalling five percent of the vote of the last general election. The Court held that, absent other restrictions of no pertinence here, this was not excessive.
 
 
 22
 Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President.
 
 
 23
 Storer, 415 U.S. at 740, 94 S.Ct. at 1284. The gathering of fourteen signatures a day would require candidates in California to recruit .02% of the total California voter pool to serve as canvassers. Gathering fourteen signatures per day would require candidates in Connecticut to recruit only .005% of the total pool to serve as canvassers. Thus, the Connecticut statute effectively requires less than half the volunteer effort that was acceptable to the Court in Storer.
 
 
 24
 Comparable petition requirements were also upheld in American Party. In that case, Texas required candidates to collect signatures totalling one percent of the total gubernatorial vote in fifty-five days. In evaluating the burden imposed by this time limitation, the Court again looked to the required number of signatures per day: "Given that time span, signatures would have to be obtained only at the rate of 400 per day ... or four signatures per day for each 100 canvassers." American Party of Texas, 415 U.S. at 786, 94 S.Ct. at 1309. The Court did not consider this an undue burden and recognized that "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." Id. at 787, 94 S.Ct. at 1309. The Connecticut statute requires 466 signatures a day, only slightly more than was upheld in American Party. Although Connecticut's population is less than that of Texas, this is mitigated by the fact that Connecticut is small, densely populated, and voters are therefore relatively easier to contact than they are in a state the size of Texas. See McGee v. Board of Elections, 669 F.Supp. 73, 79-81 (S.D.N.Y.1987).
 
 
 25
 Looking to the percentage of potential voters that must sign the petition, the number of volunteers needed, and the minimum number of signatures to be obtained each day, Connecticut's statute is, therefore, within constitutional limits. Because "[t]he State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot," Anderson, 460 U.S. at 788-89 n. 9, 103 S.Ct. at 1570 n. 9, Connecticut's ballot access laws are "reasonable," and serve an "important" state interest, Burdick, --- U.S. at ---- - ----, 112 S.Ct. at 2063-64 (quoting Anderson, 460 U.S. at 788, 103 S.Ct. at 1569).
 
 
 26
 Finally, Connecticut's ballot-access laws are also non-discriminatory. See id. --- U.S. at ---- - ----, 112 S.Ct. at 2064-66. Appellants claim that the statute is discriminatory because larger political parties may more easily recruit the volunteers necessary to gather the signatures. However, the very purpose of the petition alternative is to separate candidates on the basis of their support. This is a legitimate purpose and not unconstitutional discrimination.
 
 
 27
 We therefore affirm the district court's decision upholding Conn.Gen.Stat. § 9-465(b). Because we hold the petition alternative, standing alone, to be constitutional, we also uphold the media recognition statute for reasons stated. See Conn.Gen.Stat. § 9-465(a).
 
 
 28
 We affirm on the appeal; we reverse on the cross-appeal.
 
 
 
 [1]
 Of course, if a ballot qualification statute were wholly irrational--a coin-flip test, for example--it would not be saved by the presence of additional valid-access methods. However, the media recognition test easily survives this minimal scrutiny because it clearly has some rational relationship to the seriousness of particular candidacies