20-2179
*Libertarian Party of Connecticut v. Lamont*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2020
No. 20-2179

LIBERTARIAN PARTY OF CONNECTICUT, HAROLD HARRIS, AND
DANIEL REALE,
*Plaintiffs-Appellants*,

v.

NED LAMONT, GOVERNOR OF CONNECTICUT, AND DENISE MERRILL,
SECRETARY OF STATE OF CONNECTICUT,
*Defendants-Appellees*.

On Appeal from the United States District Court for the District of
Connecticut

SUBMITTED: SEPTEMBER 29, 2020
DECIDED: OCTOBER 2, 2020

Before:    WINTER, WALKER, AND MENASHI, *Circuit Judges*.

The Libertarian Party of Connecticut and two of its affiliated candidates sued the Governor and Secretary of State of Connecticut, arguing that the State violated Appellants' First and Fourteenth Amendment rights by requiring candidates for office to collect

signatures from electors before appearing on the general election ballot. Appellants sought a preliminary injunction prohibiting the State from enforcing the petitioning laws and requiring it to place all nominated Libertarian Party candidates on the general election ballot. The district court denied the motion for a preliminary injunction on the ground that Appellants failed to demonstrate a clear or substantial likelihood of success on the merits. We agree. Applying the *Anderson-Burdick* framework, we conclude (1) that Connecticut's laws do not impose a severe burden on Appellants' rights and (2) that the State's interest in requiring candidates for office to demonstrate some support before appearing on the ballot justified those laws. For these reasons, we affirm.

------------

Edward Bona, Plainfield, CT, *for Plaintiffs-Appellants Libertarian Party of Connecticut and Harold Harris.*

Daniel Reale, Plainfield, CT, *pro se.*

Clare E. Kindall, Solicitor General; Maura Murphy Osborne, Assistant Attorney General; and Alma Rose Nunley, Assistant Attorney General, *for* William Tong, Attorney General of the State of Connecticut, Hartford, CT.

------------

MENASHI, *Circuit Judge*:

The Libertarian Party of Connecticut and two of its candidates sued the Governor and Secretary of State of Connecticut, arguing that the State violated Appellants' First and Fourteenth Amendment rights by requiring them to gather a certain number of signatures in

unfavorable conditions before appearing on the general election ballot. They moved for a preliminary injunction to prohibit the State from enforcing the petitioning laws and to require it to place all nominated Libertarian Party candidates on the November ballot. The United States District Court for the District of Connecticut (Hall, J.) denied the motion on the ground that Appellants failed to demonstrate a substantial likelihood of success on the merits.

This appeal was calendared for argument on October 13, 2020. On September 18, 2020, Appellant Daniel Reale moved for expedited consideration of the appeal and asked that it be decided by October 2, 2020, the date on which absentee ballots are made available to voters. On October 1, 2020, we granted that motion and affirmed the judgment of the district court. We noted that an opinion would be forthcoming. In this opinion we explain the reasons for our order affirming the district court.

**I**

Under Connecticut law, a party's candidate for an office is automatically placed on the ballot if that party's candidate received more than 1 percent of the vote for that office in the last preceding general election. Conn. Gen. Stat. §§ 9-372(6), 9-379. For independent candidates and candidates whose parties do not meet the vote threshold, Connecticut law provides an alternative: a candidate may petition onto the ballot by gathering a number of signatures "equal to the lesser of (1) one per cent of the votes cast for the same office or offices at the last-preceding election ... or (2) seven thousand five hundred." *Id.* § 9-453d. After petitioning opens on the first business day of the year, *id.* § 9-453b, candidates must submit signatures "to the appropriate town clerk or to the Secretary of the State not later

than four o'clock p.m. on the ninetieth day preceding the day of the ... election," *id*. § 9-453i.

On March 10, 2020, the Governor of Connecticut declared a public health emergency. Over the following month, the Governor issued a series of executive orders designed to reduce the spread of COVID-19. On April 4, 2020, Appellants sued Governor Ned Lamont and Secretary of State Denise Merrill and alleged that Connecticut's petitioning law was unconstitutional. They sought a preliminary injunction requiring the State to place all nominated Libertarian Party candidates on the November ballot. On May 11, 2020, Governor Lamont issued Executive Order 7LL, which altered Connecticut's petitioning requirement in three ways. First, it reduced the number of signatures required by 30 percent. Second, it extended the filing deadline by two days. Third, it permitted candidates to collect signatures electronically or by mail.[1]

---

[1] Executive Order 7LL provides, in relevant part:

> For candidates seeking ballot access as a petitioning candidate or a candidate petitioning using a party designation, including a party designation for an existing minor party, the following provisions shall apply:
>
> > a. Notwithstanding the provisions of section 9-453d of the General Statutes, the number of signatures required under section 9-453d of the General Statutes shall be reduced by thirty percent.
> >
> > b. Notwithstanding the provisions of section 9-453i, the deadline for filing such petitions shall be extended by two days.
> >
> > c. Notwithstanding sections 9-453a to 9-453o of the General Statutes, a petitioning signature shall be accepted as valid without attestation of the circulator or

4

After permitting the Independent Party, the Green Party, and several individual plaintiffs to intervene, the district court denied Appellants' motion for a preliminary injunction on the ground that Connecticut's petitioning requirement imposes a reasonable, nondiscriminatory burden on candidates seeking a place on the ballot. Accordingly, the district court concluded that Appellants failed to establish a clear or substantial likelihood of success on the merits. Appellants timely appealed to this court.[2]

---

acknowledgment otherwise required if: (i) a registered voter signs a petition containing only his or her signature that is returned by U.S. mail to the candidate and later to the town clerk of the municipality or the Secretary of the State by the applicable deadline, or (ii) a registered voter signs a petition containing only his or her signature, which signature may be scanned or photographed electronically, and returned to the candidate by electronic mail and later to the town clerk of the municipality or the Secretary of the State by the applicable deadline along with a copy of the email demonstrating the electronic transmission of the petition by the registered voter. Any petition submitted in accordance with subdivisions (i) or (ii) of this subsection shall contain the information required under sections 9-453a, 9-453f and 9-453g of the General Statutes and shall include a statement by the registered voter attesting to his or her identity, and qualification as an elector and shall be signed under the penalties of false statement. If more than one signature is on a petition page, all the requirements of 9-453a to 9-453o of the General Statutes must be satisfied, provided that any existing Executive Orders governing remote notarizations may be utilized. Nothing in this Order shall preclude petitioning by any other means set forth in section 9-453a to 9-453o of the General Statutes.

[2] Only the Libertarian Party and two of its affiliated candidates (Harold Harris and Daniel Reale) appealed from the district court's judgment.

## II

We review a district court's decision to deny a preliminary injunction for abuse of discretion. *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008).

"[T]o obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. The movant also must show that the balance of equities tips in his or her favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (internal quotation marks, footnote, and alteration omitted). When the plaintiff seeks a mandatory injunction, the standard is particularly exacting: "a district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (quoting *No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001)). Because Appellants sought an injunction directing the Governor to place their candidates on the ballot, that injunction could issue only on a showing of a clear or substantial likelihood of success on the merits. *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.

Harris requires 301 signatures to appear on the ballot for state senate. Reale requires 268, 62, and 48 signatures to appear on the ballot for several offices. Appellees' App'x 11.

6

2000) ("[W]hen the injunction sought 'will alter rather than maintain the status quo[,]' the movant must show [a] 'clear' or 'substantial' likelihood of success.") (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999)); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.").

Challenges to state action restricting ballot access are evaluated under the *Anderson-Burdick* framework. Under that framework, the level of scrutiny we apply depends on the severity of the burden state law imposes on First and Fourteenth Amendment rights. When a state's election regulation imposes "'severe' restrictions" on First and Fourteenth Amendment rights, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). By contrast, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). "Review in such circumstances will be quite deferential, and we will not require 'elaborate, empirical verification of the weightiness of the State's asserted justifications.' Nonetheless, in cases … where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed." *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (quoting

7

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997)) (internal citation omitted).

Applying the *Anderson-Burdick* framework, the district court determined that Connecticut's laws impose a reasonable, nondiscriminatory burden on Appellants' rights and that Connecticut's important interest in restricting ballot access to those candidates with some demonstrated support justifies that burden. For these reasons, the district court concluded that Appellants failed to establish a likelihood of success on the merits. Because the district court did not abuse its discretion in reaching that conclusion, we affirm.

**A**

We begin with the question of whether Connecticut's laws impose a severe burden on Appellants' rights. As the Sixth Circuit has held, "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016). Accordingly, we ask whether Connecticut's petitioning laws effectively prevent Libertarian Party candidates from appearing on the ballot. "What is ultimately important is not the absolute or relative number of signatures required but whether a 'reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot.'" *Stone v. Bd. of Election Comm'rs*, 750 F.3d 678, 682 (7th Cir. 2014) (quoting *Bowe v. Bd. of Election Comm'rs*, 614 F.2d 1147, 1152 (7th Cir. 1980)).

Our decision in *LaRouche v. Kezer*, 990 F.2d 36 (2d Cir. 1993), is instructive. In that case, we considered a challenge to Connecticut's ballot access statutes by the presidential candidate Lyndon LaRouche. Rejecting the argument that Connecticut law—which required

LaRouche to gather 6,518 signatures in two weeks—imposed a severe burden on LaRouche's First and Fourteenth Amendment rights, we surveyed Supreme Court precedent assessing the constitutionality of state petitioning laws. In *Storer v. Brown*, 415 U.S. 724, 740 (1974), the Supreme Court considered the constitutionality of a state statute requiring candidates for President and Vice President to "gather[] 325,000 signatures in 24 days," a number equivalent to 5 percent of the votes cast in the state in the preceding general election. In addition to requiring a substantial number of signatures, the statute also "disqualifie[d] from signing the independent's petition all registered voters who voted in the primary," the practical effect of which was that, if a sufficient number of people voted in the primary, the eligible pool of signers could be so small as to make it impossible to satisfy the statute's numerical threshold. *Id.* at 739. Remanding the case for a determination of whether the signature requirement imposed a severe burden as applied, the Court commented on the burden the statute imposed on its face:

> Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President.

*Id.* at 740. Similarly, in *American Party of Texas v. White*, 415 U.S. 767, 778 (1974), the Court rejected a challenge to a Texas statute that permitted a gubernatorial candidate to appear on the ballot if he or she secured 22,000 signatures, a number equivalent to 1 percent of the votes cast for governor in the preceding general election. The Court observed that the statute's requirement that a candidate collect 22,000

signatures in 55 days was not "too onerous." *Id.* at 787. Although satisfying the statute would require signatures "to be obtained … at the rate of 400 per day," the Court explained that the statute was justified by Texas's "compelling" interest in "regulating the number of candidates on the ballot to avoid undue voter confusion." *Id.* at 786, 782 n.14. The Court considered the ultimate effect of the statute and concluded that "Texas 'in no way freezes the status quo'" by preventing independents from accessing the ballot. *Id.* at 787 (quoting *Jenness v. Fortson*, 403 U.S. 431, 439 (1971)). Rather, its laws "afford[] minority political parties a real and essentially equal opportunity for ballot qualification." *Id.* at 788. Applying *Storer* and *American Party of Texas*, and "[l]ooking to the percentage of potential voters that must sign the petition, the number of volunteers needed, and the minimum number of signatures to be obtained each day," we held in *LaRouche* that the Connecticut statute, which "require[d the collection of] 466 signatures a day," was "'reasonable' and serve[d] an 'important' state interest." *LaRouche*, 990 F.2d at 41 (quoting *Burdick*, 504 U.S. at 434).

Applying *LaRouche*, we conclude that, on its face, Connecticut's signature requirement does not impose a severe burden on First and Fourteenth Amendment rights because a reasonably diligent candidate could be expected to satisfy the signature requirement. *See Jenness*, 403 U.S. at 442 (upholding a statute that required a candidate to secure signatures from 5 percent of eligible electors who voted in the previous election); *Schulz v. Williams*, 44 F.3d 48, 56-57 (2d Cir. 1994) (holding that a New York statute requiring "an independent who seeks … statewide office" to "gather the signatures of 15,000 registered voters" during a 42-day period fell "well within the constitutional bounds set by *Storer*"); *Tripp v. Scholz*, 872 F.3d 857, 865 (7th Cir. 2017) (concluding that a statute requiring the collection of

10

approximately 2,400 signatures—5 percent of the voters in the previous election—in 90 days was "not severe").

We turn, then, to the main question in this appeal: whether the district court erred in concluding that Connecticut's facially constitutional petitioning statute did not impose a severe burden on Appellants' First and Fourteenth Amendment rights as it was applied in this case. Appellants make two arguments.

Appellants first argue that in-person petitioning was essentially prohibited by Governor Lamont's executive orders. In the proceedings before the district court, they pointed to Executive Order 7H, which provides, in relevant part:

> Effective on March 23, 2020 at 8:00 p.m. and through April 22, 2020, unless earlier modified, extended, or terminated by me, all businesses and not-for-profit entities in the state shall employ, to the maximum extent possible, any telecommuting or work from home procedures that they can safely employ. Non-essential businesses or not-for-profit entities shall reduce their in-person workforces at any workplace locations by 100% not later than March 23, 2020 at 8:00 p.m. Any essential business or entity providing essential goods, services or functions shall not be subject to these in-person restrictions.

App'x 88-89. Appellants' position is that, because petitioning is not designated as an essential business activity, Executive Order 7H prohibits it. The district court rejected this argument, observing that neither Executive Order 7H nor any other executive order "expressly prohibits or restricts" in-person petitioning. *Id.* at 130. That is true, but the question is closer than the district court's analysis suggests. The order's requirement that non-essential businesses "reduce their in-

11

person workforces at any workplace location" might plausibly be read to require candidates to avoid employing petition canvassers. Nevertheless, we need not determine whether Executive Order 7H forbade in-person petitioning. As the district court correctly explained, Connecticut clarified its position on the matter in a May guidance document that explicitly provided that in-person petitioning could be conducted so long as it was done in a manner consistent with Connecticut's social distancing guidelines. *See id.* at 130 ("This year, defendants had clarified by mid-May that petitions may be circulated in person consistent with social distancing protocols.") (internal quotation marks and alteration omitted). Even assuming that Executive Order 7H prohibited in-person petitioning in the nearly two months between its issuance and the promulgation of the guidance document, that would have left Appellants two months prior to Executive Order 7H's issuance and two months after Connecticut clarified its position in which to gather signatures.

Appellants next argue that, irrespective of the legality of in-person petitioning, the pandemic and the Governor's executive orders have made petitioning nearly impossible. In support of their argument, Appellants presented to the district court limited evidence about the feasibility of in-person petitioning. The Independent Party plaintiffs presented additional evidence, including declarations describing the diminished success rate of in-person petitioning. Though Executive Order 7LL authorized alternative methods, Appellants argue that those methods were impractical based on the declarations of Appellants Harris and Reale. Harris declared that he prepared "letters with petitions and prepaid postage including return postage, 140 going to Greens and Libertarians and another 400 going to registered Independents," that the preparation "took four hours of

time, four hours of labor, and a lap time of seven days," and resulted in ten signatures. App'x 104-05. Reale declared that mail was not an effective means of collecting signatures because "[m]ail turn around time remains slow." *Id.* at App'x 108.

Both Harris and Reale insisted that collecting signatures electronically was not feasible either. Harris alleged that he lacked the technical ability or software necessary to collect signatures electronically; Reale claimed that the Libertarian Party "do[es] not have the resources to develop electronic signature gathering software that would comply with Executive Order 7LL." *Id.* at 107. Appellants also argued that compliance with Executive Order 7LL would impose substantial costs on account of the record-keeping obligations it allegedly imposes on candidates. The Independent Party plaintiffs similarly declared that petitioning by mail would be prohibitively expensive and that they lacked the infrastructure to petition electronically.

Rejecting Appellants' arguments, the district court relied on the declaration of Theodore Bromley, Connecticut's Director of Elections. In his declaration, Bromley explained that several candidates successfully petitioned onto the primary ballot using a combination of in-person, electronic, and mail petitioning; these candidates obtained many signatures—sometimes numbering in the hundreds—over a 17-day period. Candidates also petitioned onto the general election ballot. Ernestine Holloway, a candidate from the Independent Party—and one of the declarants in support of the Independent Party's motion for a preliminary injunction—obtained petitioning papers on May 27, 2020. By June 18, 2020—23 days later—Holloway had collected 87 signatures, a collection rate of nearly four signatures a day that satisfied the statutory requirement and qualified

13

her for the ballot. This evidence undercuts Appellants' argument that a diligent candidate would be unable to secure a place on the ballot by petition.

On this record, we cannot say that the district court abused its discretion in concluding that Connecticut's laws impose only a reasonable, nondiscriminatory burden. The petitioning period ran for 218 days—from January 2 to August 7—and the evidence demonstrates that petitioning was possible even under the challenging conditions in the State of Connecticut. For that reason, we affirm the district court's decision that Connecticut's petitioning laws do not impose a severe burden on Appellants' First and Fourteenth Amendment rights.

**B**

We also agree with the district court that important state interests justify the burden that Connecticut's laws impose. The Supreme Court has repeatedly held that "[t]he State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Anderson*, 460 U.S. at 788 n.9. This court and others have recognized that signature requirements are an appropriate means of vindicating that interest. *See Schulz*, 44 F.3d at 57-58 (explaining that a state's interest in "limiting the ballot to those candidates who have demonstrated support" is "by no means novel and ha[s] long enjoyed support in the case law"); *Barr v. Galvin*, 626 F.3d 99, 111 (1st Cir. 2010) (upholding a signature requirement "[i]n light of the state's legitimate interest in ensuring that the candidates who appear on the statewide ballot have

demonstrable support among the voting public"). The district court did not err in concluding that this important interest justified the burden Connecticut's laws impose on Appellants.[3]

## CONCLUSION

For the foregoing reasons we **AFFIRM** the judgment of the district court.

---

[3] Appellants suggest on appeal that the Governor lacked authority under state law to issue Executive Order 7LL. We decline to address this argument because it was forfeited, *see Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."), and in any event would be an improper basis for an injunction from a federal court, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").