20-3047-cv
SAM Party of N.Y. v. Kosinski

# United States Court of Appeals
# for the Second Circuit

August Term, 2020

(Argued: December 15, 2020　　　Decided:　February 10, 2021)

Docket No. 20-3047-cv

———————————————————————

SAM PARTY OF NEW YORK, MICHAEL J. VOLPE,

*Plaintiffs-Appellants*,

v.

PETER S. KOSINSKI, as the Co-Chair of the New York State Board of Elections, DOUGLAS A. KELLNER, as the Co-Chair of the New York State Board of Elections, ANDREW J. SPANO, as a Commissioner of the New York State Board of Elections, TODD D. VALENTINE, as Co-Executive Director of the New York State Board of Elections, ROBERT A. BREHM, as Co-Executive Director of the New York State Board of Elections,

*Defendants-Appellees*,

ANDREW CUOMO, as the Governor of the State of New York, ANDREA STEWART-COUSINS, as the Temporary President and Majority Leader of the New York State Senate, JOHN J. FLANAGAN, as the Minority Leader of the New York State Senate, CARL E. HEASTIE, as the Speaker of the New York State Assembly, BRIAN M. KOLB, as the Minority Leader of the New York State Assembly,

*Defendants*.

———————————————————————

Before:

SACK, PARK, and MENASHI, *Circuit Judges*.

The State of New York enacted new party-qualification requirements in the spring of 2020. Political organizations must now earn the greater of 130,000 votes or 2% of the vote in elections for President and for Governor to achieve party status and the automatic place on the ballot it confers. Appellants SAM Party of New York and its chairman Michael J. Volpe appeal an order of the United States District Court for the Southern District of New York (Koeltl, *J.*) denying their motion for a preliminary injunction against the party-qualification requirements. We hold that Appellants are not likely to succeed on the merits of their First Amendment claim because the burden imposed by the presidential-election requirement is (1) not severe and (2) justified by the State's interest in uncluttered ballots, effective electoral competition, and the preservation of resources dedicated to public financing of elections. **AFFIRMED**.

ERIC A. STONE (Kannon K. Shanmugam, Robert A. Atkins, Brette Tannenbaum, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York *for Plaintiffs-Appellants*.

ELLIOT A. HALLAK (Daniel R. LeCours, Thomas J. Garry, Kyle D. Gooch, *on the brief*), Harris Beach PLLC, Albany, New York *for Defendants-Appellees*.

PARK, *Circuit Judge*:

New York recently amended its election laws to condition status as a "political party" on an organization's performance in presidential elections. The SAM Party of New York ("SAM Party") is a political organization that, for a mix of ideological and practical reasons, chose not to participate in the 2020

presidential election. It argues that the new presidential-election requirement violates its members' First and Fourteenth Amendment rights. But unless the burden on such rights is severe or unjustified, "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). New York law provides reasonable avenues for ballot access to organizations that do not participate in the presidential election. The presidential-election requirement can also be justified by the State's interest in decluttering its ballots, preventing voter confusion, and preserving the public fisc. The district court appropriately denied the SAM Party's motion for a preliminary injunction, and we affirm.

## I. BACKGROUND

A. <u>April 2020 Electoral Reforms</u>

New York law distinguishes between political parties and independent bodies. *Compare* N.Y. Elec. Law § 1-104(3), *with id.* § 1-104(12). Parties, which have more popular support, enjoy certain privileges but are subject to structural and filing requirements. One of the principal privileges of party status is a designated ballot line or "berth." *Id.* § 7-104(4). For several major offices, the winner of a

party's nomination process is automatically included on the ballot. But independent bodies seeking to place candidates on the ballot must gather the requisite number of signatures for each candidate. *Id.* §§ 6-102, 6-104, 6-106, 6-114, 6-142. Parties also enjoy access to primaries administered by the government, automatic membership enrollment from voter-registration forms, and permission to maintain a financial account, exempt from ordinary contribution limits, to pay for office space and staff. *Id.* §§ 5-300, 14-124(3).

For 85 years, New York conferred party status on a political organization if it won at least 50,000 votes in the quadrennial gubernatorial election. As the number of voters in New York increased, this threshold became relatively low, as did the number of signatures required on an independent body's nominating petition. Apparently as a result, the State has seen its share of colorful-if-quixotic runs for office. *See, e.g.*, William F. Buckley, Jr., *The Unmaking of a Mayor* (1966); Rent is Too Damn High Party, http://www.rentistoodamnhigh.org (last visited Feb. 8, 2021). Eight organizations met the party-status threshold in the 2018 gubernatorial election.

The State amended its party-qualification requirements in April 2020. It raised the threshold from 50,000 votes to the greater of 130,000 votes or 2% of the

4

total vote. *See* N.Y. Elec. Law § 1-104(3). And instead of requalifying every four years, political organizations must now requalify by meeting the higher threshold in the gubernatorial *and* presidential elections, one of which occurs every two years. *Id.* The New York State Campaign Finance Review Commission proposed these changes as part of a larger package of reforms that includes public financing for qualifying candidates in state races. The New York State Legislature passed and Governor Andrew Cuomo signed the package into law as part of the budget for fiscal year 2021. *See* 2020 N.Y. Laws Ch. 58 (S. 7508-B). Public financing is scheduled to begin after the 2022 general election. *Id.* pt. ZZZ, § 12.

B.     The SAM Party's Challenge

The SAM Party describes itself as a "new kind of candidate-focused, process-driven political party, rather than one predicated on shared substantive policy positions or ideologies." App'x at 457 (Decl. of Michael J. Volpe in Supp. of Pls.' Mot. for Prelim. Inj. (May 18, 2020), ¶ 2). SAM stands for Serve America Movement, and the SAM Party subjects candidates for village, town, county, regional, and statewide office to a scorecard based on the four "pillars" of "transparency, accountability, electoral reform, and problem solving." *Id.* at 459 (¶ 8). Although the SAM Party has nominated several of its own candidates for

office, most of its candidates are shared with another political party. New York has a "fusion voting" system, by which the same candidate for office can be listed on each of several parties' designated ballot lines and earns the total votes cast on all his or her ballot lines. *See* N.Y. Elec. Law § 7-104.

SAM became a political party in 2018 when it ran a gubernatorial ticket of Stephanie Miner, the former mayor of Syracuse, a Democrat, and Michael J. Volpe, the former mayor of Pelham, a Republican. Because it was then just an independent body, to get Miner and Volpe on the ballot, the SAM Party was required to obtain signatures from 15,000 New York voters, including at least 100 from each of one-half of the State's congressional districts. *See id.* § 6-142 (2018). The Miner-Volpe ticket earned 55,441 votes, just exceeding the party-status qualification threshold then in place. In the three years since becoming a political party, the SAM Party has nominated dozens of successful candidates. In the most recent election cycle, the SAM Party endorsed nineteen successful candidates—from village trustee to the House of Representatives—all of whom appeared on its ballot line and were also nominated by either the Republican or Democratic Party.[1]

---

[1] *See* Press Release, *SAM Party of New York Gives Voters a Choice in 2020 Elections*, SAM Party of NY (Dec. 11, 2020), http://joinsamny.org/uncategorized/sam-party-of-new-york-gives-voters-a-choice-in-2020-elections.

The new requirements jeopardize the SAM Party's status as a political party. It wishes to "avoid getting prematurely embroiled in, or associated with, one side or the other of the ideological divide," fearing that taking positions on substantive issues or entering high-profile contests would detract from its process-driven mission and message. App'x at 461 (Volpe Decl. ¶ 13). The SAM Party is thus "very careful" about the races it chooses to enter. App'x at 556 (Decl. of Scott W. Muller in Supp. of Pls.' Mot. for Prelim. Inj. (May 18, 2020), ¶ 15).

When New York adopted the presidential-election requirement in the spring of 2020, the SAM Party chose not to contest the race for President and filed this lawsuit instead. The SAM Party decided not to cross-nominate Donald Trump or Joseph Biden because doing so would be "brand suicide," tagging itself "forever" with a set of positions on hot-button issues it has to this point eschewed. Appellants' Br. at 24. It also determined that running its own candidate for President would be futile because the SAM Party is organized as an official party only in New York. Indeed, the only two minor parties to retain party status after the November 2020 presidential election are the Conservative Party and the

Working Families Party, each of which cross-nominated one of the two major candidates.[2]

The SAM Party challenges New York's new presidential-election party-qualification requirement, alleging that it unconstitutionally burdens the associational rights of its members and compels their speech. The SAM Party does not challenge the increase to the qualification threshold for the gubernatorial election.

The SAM Party moved for a preliminary injunction to enjoin the State from stripping it of party status in the wake of the 2020 presidential election. The United States District Court for the Southern District of New York (Koeltl, *J.*) entered an opinion and order denying the motion. The district court concluded that the SAM Party had "failed to demonstrate that allowing the amended party qualification requirements to take effect would violate their Constitutional rights, otherwise cause irreparable harm to the plaintiffs, or be against the public interest." *SAM Party v. Kosinski*, --- F. Supp. 3d ---, No. 20-cv-323, 2020 WL 5359640, at *2 (S.D.N.Y. Sept. 1, 2020). The SAM Party and Volpe now appeal from that order. *See* 28 U.S.C. §§ 1292(a)(1), 1331, 1343.

---

[2] *See* N.Y. Bd. of Elections, Certified Results for the 11/3/2020 General Election (Dec. 3, 2020), http://www.elections.ny.gov/2020ElectionResults.html.

## II. DISCUSSION

To obtain a preliminary injunction against government enforcement of a statute, the SAM Party must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "We review a district court's decision to deny a preliminary injunction for abuse of discretion." *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 176 (2d Cir. 2020). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id.* (quoting *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008)).

A. <u>Likelihood of Success on the Merits</u>

The U.S. Constitution grants States "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). "The First Amendment protects the right of citizens to associate and to form political parties

for the advancement of common political goals and ideas." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). Courts have recognized that the exercise of this right to associate and to form political parties depends on an effective—and effectively democratic—electoral process. "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358; *accord Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Courts have thus eschewed strict scrutiny in challenges to party-qualification requirements. "[T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently. Accordingly, the mere fact that a State's system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (cleaned up).

Instead of strict scrutiny, courts apply what has come to be known as the *Anderson–Burdick* framework. "Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at

434. First, if the restrictions on those rights are "severe," then strict scrutiny applies. *Id.* "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788).

This latter, lesser scrutiny is not "pure rational basis review." *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108 (2d Cir. 2008). Rather, "the court must actually 'weigh' the burdens imposed on the plaintiff against 'the precise interests put forward by the State,' and the court must take 'into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 108–09 (quoting *Burdick*, 504 U.S. at 434). Review under this balancing test is "quite deferential," and no "elaborate, empirical verification" is required. *Id.* at 109 (quoting *Timmons*, 520 U.S. at 364).

1.  *Severity of the Burden*

Courts have identified three types of severe burdens on the right of individuals to associate as a political party. First are regulations meddling in a political party's internal affairs. *See, e.g., Cal. Democratic Party v. Jones*, 530 U.S. 567, 581–82, 586 (2000); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229–31

(1989); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 215–16 (1986). Second are regulations restricting the "core associational activities" of the party or its members. *Timmons*, 520 U.S. at 360. *See, e.g.*, *Eu*, 489 U.S. at 223.[3] Third are regulations that "make it virtually impossible" for minor parties to qualify for the ballot. *Williams v. Rhodes*, 393 U.S. 23, 25 (1968). *See, e.g.*, *Norman v. Reed*, 502 U.S. 279, 289 (1992); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185–86 (1979); *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004). The SAM Party likens the presidential-election requirement's burden to these latter two types.

We disagree. First, the presidential-election requirement does not severely burden the SAM Party's core associational activities. The SAM Party argues that the presidential-election requirement compels it to speak on the hot-button issues at stake in a presidential election. But we are not persuaded. A law that ties party status to a political organization's demonstrated support in a designated race does not "force" the organization "to divert its resources in any particular way." *Person*

---

[3] Direct regulation of "core political speech" arguably falls into this category. *Lerman v. Bd. of Elections*, 232 F.3d 135, 146 (2d Cir. 2000). Such restrictions are *per se* severe, so courts effectively bypass the *Anderson–Burdick* framework. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–45 (1995); *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 207–08 (1999) (Thomas, *J.*, concurring in the judgment).

*v. N.Y. State Bd. of Elections*, 467 F.3d 141, 144 (2d Cir. 2006) (upholding the challenge of a candidate for Attorney General to the gubernatorial-election requirement). That is because parties remain "free to choose not to seek official status." *Id.* An independent body may still operate in the political arena and run candidates. Indeed, this is how the SAM Party made its way onto the ballot three years ago. We thus reject the claim that the presidential-election requirement compels speech.

The SAM Party's second theory—that the presidential-election requirement is a "severe" impediment to the development of minor parties like itself—also fails. As we have recently explained, "the hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Conn.*, 977 F.3d at 177 (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016) (alterations omitted)). To gauge whether minor parties have been so burdened, we look at the "combined effect of [New York's] ballot-access restrictions." *Libertarian Party of Ky.*, 835 F.3d at 575 (internal quotation marks omitted).

As an initial matter, the presidential-election requirement does not "virtually exclude" minor parties from the ballot. New York's 2% threshold is in the middle of the pack among the three-dozen states that require parties to obtain

a certain level of support in a statewide race. Several federal courts of appeals have approved of thresholds as high and higher. *See, e.g.*, *id.* (upholding 2% presidential-election requirement); *Green Party of Ark. v. Martin*, 649 F.3d 675, 682–83 (8th Cir. 2011) (upholding 3% presidential-election requirement); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1222–23 (4th Cir. 1995) (upholding 10% presidential-election requirement to requalify as a party); *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982) (same). In fact, two minor parties—the Conservative Party and the Working Families Party—easily cleared the presidential threshold during the most recent cycle.

There is also no "severe burden" because the SAM Party could compete as an independent body. Under the current signature thresholds (which were also amended in April 2020), an independent body can place a candidate on the ballot for a statewide race by collecting 45,000 signatures, a number that will never exceed 1% of the off-year electorate. *See* N.Y. Elec. Law §§ 6-138, 6-142(1). And in the county and State Assembly offices in which the SAM Party has participated, the number is 1,500 signatures or 5% of the off-year electorate, whichever is less. *Id.* § 6-142(2)(a), (g). These requirements pale in comparison to the ones the Supreme Court upheld in *Jenness v. Fortson*, 403 U.S. 431 (1971). In *Jenness*, political

14

organizations receiving less than 20% of the vote in the most recent gubernatorial or presidential election—*i.e.*, all minor parties—would need to amass signatures representing 5% of the electorate to place a candidate for statewide office on the ballot. *Id.* at 433–34. While a 15% signature requirement imposes a severe burden, *see Williams v. Rhodes*, 393 U.S. 23, 25 (1968), a requirement as high as 5% "in no way freezes the status quo" and thus does not "abridge[] the rights of free speech and association secured by the First and Fourteenth Amendments." *Jenness*, 403 U.S. at 439–40; *see also Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997); *Rainbow Coal. of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 741–44 (10th Cir. 1988). The signature requirements set by the State of New York are significantly lower than these, and "a reasonably diligent [organization] could be expected to satisfy [New York's] signature requirement." *Libertarian Party of Conn.*, 977 F.3d at 179.[4]

---

[4] The SAM Party also argues that having to compete as an independent body imposes a burden that is particularly significant for its chosen strategy of lending an "imprimatur" to candidates nominated by other parties. But the Constitution does not require any state to "compromise the policy choices embodied in its ballot-access requirements to accommodate [a political organization's] strategy." *Timmons*, 520 U.S. at 365.

In short, the presidential-election requirement does not impose a severe burden on the SAM Party. It does not compel speech, and New York law provides alternative means for political organizations to compete in elections.

2. *Weighing the State's Interests*

We agree with the district court that the SAM Party is not likely to show that the State's interests fail to justify the presidential-election requirement. The balancing test at the second stage of the *Anderson–Burdick* framework is "quite deferential." *Price*, 540 F.3d at 109. "[A] State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (cleaned up). Otherwise, we would "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman*, 544 U.S. at 593.

The State contends that the presidential-election requirement is a justifiable means of gauging whether a party continues to enjoy a sufficient "modicum" of support deserving automatic ballot access. "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even

16

frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442. And this interest is more than a matter of uncluttered ballot layout or simplified election administration. In enacting regulations that limit the number of candidates on the ballot, "the State understandably and properly seeks to . . . assure that the winner is the choice of a majority, or at least a strong plurality, of those voting." *Bullock v. Carter*, 405 U.S. 134, 145 (1972).

The State has a second reason for its new party-status threshold: its interest in conserving limited resources devoted to public financing of state elections. Following the 2022 general election, New York will match funds raised by candidates. According to the State, more minor political parties will mean more public dollars spent on unpopular candidacies. That is in part because matching funds are used in primary elections and only political parties have primary elections, and it is in part because only those candidates appearing on the ballot will be eligible. *See* N.Y. Elec. Law § 14-203 (effective Nov. 9, 2022). The government's "interest in not funding hopeless candidacies with large sums of public money necessarily justifies the withholding of public assistance from candidates without significant public support." *Buckley v. Valeo*, 424 U.S. 1, 96 (1976) (citation omitted).

17

The SAM Party does not dispute the legitimacy of these interests. It argues instead that the presidential-election threshold will not meaningfully further those interests. According to the SAM Party, "[t]he presidential-election requirement is too blunt an instrument to gauge whether an organization has that bare modicum of support among the New York electorate." Appellants' Br. at 34. But "popular vote totals in the last election are a proper measure of public support." *Green Party of Conn. v. Garfield*, 616 F.3d 213, 231 (2d Cir. 2010) (quoting *Buckley*, 424 U.S. at 99–100). Parties run individual candidates and not lists as in some countries, so it is reasonable to gauge a party's support by its candidate's performance in the top-of-the-ticket race. The SAM Party also contends that the increased qualification thresholds for gubernatorial elections suffice to vindicate the State's interest in ensuring that official parties enjoy adequate popular support, making the presidential-election requirement unnecessary. But the State may seek to measure popular support in a more timely fashion, and the presidential election is the only statewide race that always occurs off-cycle from the State's gubernatorial election.

The SAM Party also relies on reports from the Brennan Center for Justice and the Campaign Finance Institute to argue that the spending caps and other eligibility requirements built into the fund-matching formulas will cause public

18

spending on minor parties to be insubstantial. But we do not require "elaborate, empirical verification" of the State's justifications. *Timmons*, 520 U.S. at 364. Moreover, even if the State has installed other measures aimed at preventing nonviable candidacies from receiving public funds, it may pursue multiple avenues towards that goal.

The State has set forth a coherent account of why the presidential-election requirement will help to guard against disorder and waste. Under the "quite deferential" review at this step, *Price*, 540 F.3d at 109, that is enough to justify the burden the requirement imposes on the SAM Party's members. We thus conclude that the SAM Party is not likely to succeed on the merits of its claim.

B.  Irreparable Harm

Without an injunction, the SAM Party will lose its status as a political party after failing to meet the vote threshold in the 2020 presidential election. The SAM Party argues that this will harm its members' First Amendment associational and speech rights. The presence of irreparable injury to First Amendment rights, however, "turns on whether the plaintiff has shown a clear likelihood of success on the merits," which SAM has failed to do. *Beal v. Stern*, 184 F.3d 117, 123–24 (2d Cir. 1999); *see also Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d

19

Cir. 2003) (holding that the presumption of irreparable harm applies only when the challenged law "directly limits speech" and not, as here, where the law "may only potentially affect speech").  Thus, the SAM Party has not met its burden of demonstrating that it will be irreparably harmed without an injunction.

C.    Public Interest

In a suit against the government, balancing of the equities merges into our consideration of the public interest.  *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).  As explained above, the presidential-election requirement serves important regulatory interests.  Certainly, "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), but that is of no help to a plaintiff like the SAM Party that is not likely to succeed on its First Amendment claim.  Moreover, while some voters would surely like to see the SAM Party automatically included on their ballot in the next cycle, the interest of those voters does not outweigh the broader public interest in administrable elections, ensuring that parties enjoy a modicum of electoral support, and the conservation of taxpayer dollars.

**III.  CONCLUSION**

For the reasons set forth above, the district court's judgment is affirmed.